Earl H. PRATZ, Sr., etc., et al.

v.

LOUISIANA POLYTECHNIC INSTI-
TUTE et al.

Civ. A. Nos. 15081, 15369. .

United States District Court,
W. D. Louisiana,
Monroe Division.

July 10, 1970.

Paul Henry Kidd, Anthony J. Bruscato, Monroe, La., for plaintiffs.

Thomas A. Grant, III, Theus, Grisham, Davis & Leigh, Robert C. Downing, Hudson, Potts & Bernstein, Monroe, La., Fred Benton, Jr., Benton & Moseley, Baton Rouge, La., for defendants.

Before AINSWORTH, Circuit Judge, and DAWKINS and HUNTER, District Judges.

DAWKINS, Chief District Judge:

The important issue here is whether a State-supported institution of higher education may, through the establishment of reasonable parietal regulations, require students to live and eat their meals in facilities provided by the institution.

Plaintiffs, and the class they represent, are students at Louisiana Polytechnic Institute (hereinafter sometimes referred to as Tech), a four-year, co-educational institution located at Ruston, Louisiana. Tech was created by Article 12, Section 9, of the Constitution of Louisiana and is under the supervision and control of the Louisiana State Board of Education (hereinafter sometimes referred to as Board), an agency of the State created by La.Const. Art. 12, Sec. 4.

Plaintiffs seek to have this Three-Judge Court[1] declare unconstitutional resolutions of the Board (and Tech regulations pursuant to Board resolutions) which require them to live in dormitories while students at Tech. Those resolutions provide in pertinent part:

Schedule 44

"A RESOLUTION FURTHER DEFINING THE PURPOSES AND POLICY FOR THE UTILIZATION OF HOUSING, DINING AND STUDENT LIFE FACILITIES IN THE STATE OF LOUISIANA.

\* \* \* \* \* \*

"Section 2. It is the policy and philosophy of higher education in the State of Louisiana as interpreted by this Board (subject to recognition by this Board of the differences that exist between the several colleges and universities and the need for reasonable flexibility in the administration thereof) that all unmarried full-time undergraduate students, regardless of age or whether or not emancipated, are required to live in on-campus residence halls as long as space is available \* \* \*. Exemptions from on-campus residence requirement may be granted by Proper Officials of each college or university:

"A. In any case where it appears that a full-time undergraduate student will otherwise suffer significant hardship or because of sufficient financial, medical or other good and sound reasons shown.

"B. In the case of older students, as, for example, (i) a returning military veteran; (ii) a previously married person where Proper Officials make a finding of fact that such individual is by virtue of age and experience incompatible with the educational objectives and values sought to be provided by on-campus residence herein outlined \* \* \*."

The second resolution is as follows:

Schedule 45

"A RESOLUTION PERTAINING TO OFF CAMPUS RESIDENCE OF STUDENTS WHEN SPACE IS NOT AVAILABLE IN ON-CAMPUS RESIDENCE HALLS.

[This resolution provides for the granting of additional exemptions "consistent with the objectives and purposes of higher education" and in order to assure "equal treatment and protection to students similarly situated" in order of priority as follows:]

"1. First, undergraduate students living with parents, grandparents, married brother or sister or in supervised sorority or fraternity housing.

"2. Second, seniors.

"3. Third, juniors.

"4. Fourth, sophomores

"5. Fifth, freshmen.

"Within each of the foregoing classifications, the following additional rules of priority shall be applied:

"1. First shall be the students who have resided in off-campus housing for the longest period of time since attending the institution.

"2. Second, in accordance with the order of date of application filed. (A list may be kept of those full-time graduate students indicating a desire to live off-campus, showing the date each application was made.)"

Due to the important constitutional issues involved in this case, both sides have spent a great deal of time and effort presenting their respective positions. They have argued with every conceivable legal weapon which could be used to gain them victory. Out of all the barrages which have been fired, it is now our task to select the truly de-

1. Our jurisdiction is based on 28 U.S.C. § 1343(3) and 42 U.S.C. § 1981 et seq. This case was submitted on stipulations, briefs, affidavits and oral argument. It was agreed that this Court may take judicial notice of those factors concerning State Universities and Colleges with which all are familiar.

876

terminative points and from these to decide the proper outcome.

■ It is clear that a State Board of Education and a State University are agencies of the State and are subject to control by the State involved. Consequently, the actions of the Board and Tech are State action and students may not be deprived by such action of those bill of rights guarantees to which States have been subjected by the Courts under the Fourteenth Amendment, as well as the protections guaranteed by that Amendment itself. Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1961); McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

Because each side has asked us to consider so many issues, we think it best at the outset here to synopsize what we believe to be the main contentions of both parties and then consider the specific allegations separately.

In brief, plaintiffs assert that students are indeed citizens, that by enrolling in a State-supported institution, they do not give up any of their basic constitutional rights they possessed as non-students. They assert that the First Amendment guarantees them the right to move about, among and in the respective States in any manner they see fit, that it allows them to associate, or not to associate, with anyone they may choose, and that they have certain rights of privacy which are violated when made to live in a communal type arrangement. They further assert that the contested rules deprive them of certain property rights in that it is possible for a student to live at less cost in non-campus housing and eating facilities than it does in those provided by the State. They say the resolutions are unreasonable and capricious and violate the equal protection of laws of the United States and of Louisiana. Further, they contend that the main reason the resolutions were enacted was to insure that a sufficient number of students occupy the dormitories that revenues from such occupancy will be adequate to retire the bonded indebtedness created when the dormitories and eating facilities were constructed.

■ Defendants strongly refute all of plaintiffs' allegations, especially those concerning the bonded indebtedness. Defendants acknowledge that while they are concerned with what the effect would be for us to strike down the resolutions, the bonds are an obligation of each institution which has incurred that sort of indebtedness, and if revenues from dormitory occupancy are insufficient to retire the bonds, such obligations must be borne by all members of the student body as additional tuition cost. Defendants' main argument is that the so-called parietal rules,[2] as embodied in the

2. We pause here to put in its proper context the phrase "parietal rules." "Parietal" is derived from the Latin word "paries, parietis"—"a wall." In the United States the meaning pertains to residence within, or pertaining to life within, the buildings of a college or university. See Webster's New Collegiate Dictionary, 2d ed. For example, in 1837 "Orders and Reg. Harvard Univ. 12" stated:
"The offiders [sic] resident within the college wall shall constitute a permanent standing committee of the faculty to be called the parietal committee. This committee shall have particular cognizance of all offenses against good order and decorum within the walls."
In one of their main thrusts, plaintiffs assert the doctrine of "in loco parentis" is dead. We find a definition of "in loco parentis" in Black's Law Dictionary:
"In the place of a parent; instead of a parent; charged factitiously with a parent's rights, duties and responsibilities."
Defendants point out that Louisiana educational institutions have never attempted to operate under a theory of "in loco parentis" because of the tort liability which may have attached as a result of such assumption. See La. Civil Code Art. 2318.
We tend to agree with that line of thinking which states that the modern college or university, which has in attendance thousands of students, even if it should, is ill-equipped to regulate the off-campus social and moral lives of its students, thus making futile, and perhaps improper,

contested resolutions, are based on the soundest of educational principles and thinking. Numerous authoritative affidavits in the record point out that educators of the highest calibre from throughout the Nation feel that the living and learning concepts espoused by the regulations have the highest educational value and should be enforced as being in the best interest of all students, present and future. Though defendants admit that some individuals may be able to live and eat off-campus at lesser cost than in campus facilities, they are able to do so only by living in a substandard environment and eating food which is deficient in the basic nutritional aspects called for in a healthful diet. Further, defendants point out that a student may choose to attend any school he pleases, as long as he is qualified, therefore his right to move about as he pleases is in no way restricted; that his freedom of association certainly is not restricted; that his right to privacy is in no way affected by parietal rules (in that the Fourth Amendment adequately protects such rights); and that the exemption priorities and hardship rules established by the resolutions certainly prevent any student from being subjected to any undue problems.

■ We will not enter that thicket of legal brambles concerning whether one possesses a "right" or a "privilege" to attend a State-supported institution.[3] Rather, we are content to acknowledge that students and State-supported institutions form a special relationship with each other, and the interest possessed by the student is entitled to constitutional protection. Thus, a student does not give up any basic constitutional right when he enters a State college or university:

"First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights of freedom of speech or expression at the school house gate. * * *

"In our system, state operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the state must respect, just as they themselves must respect their obligations to the state." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed. 731 (1968).

Since the 1920's, when State institutions of higher learning began to take on their modern role and image, the Federal Government has been deeply concerned with the provision of adequate campus housing and eating facilities on terms more favorable than those available in the private market and has made it possible, through loans and guarantees of loans, that such accommodations are provided at rates students as a whole can afford. Congressional concern and action has been continuous, and as late as 1968 we find the following in the legislative history of the Housing Act of 1950, as amended:

"The committee has found that there is a need for vast increases in student housing to meet future enrollment increases; to alleviate overcrowding resulting from past enrollments; * *

any attempt to act "in loco parentis." *Zanders, infra,* fn. 3; Buttny v. Smiley, 281 F.Supp. 280 (D.C.Colo.1968); Moore v. Student Affairs Committee of Troy State University, 284 F.Supp. 725 (D.C. Ala.1968); Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969).

Thus, when "parietal" is used herein, we and defendants are speaking of those regulations affecting the educational, particularly the living portion, sphere of a university's function.

3. *Cf.* Zanders v. Louisiana State Board of Education, 281 F.Supp. 747 (W.D.La. 1968).

*the lack of adequate housing may be the bottleneck in meeting our growing higher educational needs, since the relative expansion capacity of academic facilities cannot be fully utilized without available student housing at the lowest possible cost to users of the housing facilities.* \* \* \* The need may be even greater than anticipated when returning Vietnam veterans take advantage of their GI educational benefits." 1968 U.S. Code Congressional and Administrative News, pp. 2978, 2979. (Emphasis added.)

All of the legislative history in this field of higher education clearly indicates that private lending institutions should be the normal sources of credit for the construction of such facilities. Because of this, the regulations for the Federal housing programs were written so that the private capital market would be given the first chance to make the loans. Thus, it was necessary for Federal administrators to specify that terms and conditions for Federal loans must conform to current market requirements, and 12 U.S.C. § 1749a[c] [9] provides general authority for the adoption of bond resolutions with parietal rule covenants as necessary security devices:

"[9] Include in any contract or instrument made pursuant to this subchapter such other covenants, conditions, or provisions he (the Commissioner) may deem necessary to assure that the purposes of this subchapter will be achieved."

■ The administrative practice founded in federal statutory law specifically approved by regulations promulgated by the appropriate agency of the United States Government and successfully followed in the administration of one of the major national objectives—higher education—is entitled to a strong presumption of constitutional validity.

Just as the federal government has deemed adequate housing and dining facilities to be one of the most important parts of a proper system of higher edu-

cation, so have the legislatures of the respective States, including Louisiana. These bodies have authorized colleges and universities under their jurisdiction to build and equip dormitory, dining and student life facilities, and to pay for them through reasonable rental charges paid by occupants of these buildings:

"It cannot be questioned that proper housing for students is an integral part of the responsibility pleaced upon the authorities of the University of Oklahoma. The great majority of the students must have a home away from home while attending school at the University, and it is incumbent upon school authorities to see that all precautions are taken to insure that not only adequate but also suitable housing is available." Pyeatte v. Board of Regents of the University of Oklahoma, 102 F.Supp. 407, affirmed 342 U.S. 936, 72 S.Ct. 567, 96 L.Ed. 696 (1952).

Plaintiff Pyeatte, in the case just cited, was the owner of a rooming house who contested the housing regulations of the University of Oklahoma since they prevented her from having as many roomers as she would have liked. There the Court pointed out:

"It would appear that if any right has been violated, it would be the right of the student to contract for a place to live of his own choice and not a right of a person in the position of the plaintiff. Even so, as stated in Alaska Packers Association v. Industrial Accident Commission of California, 294 U.S. 532, 543, 55 S.Ct. 518, 79 L.Ed. 1044 \* \* \*: 'Legislation otherwise within the scope of acknowledged state power, not unreasonably or arbitrarily exercised, cannot be condemned because it curtails the power of the individual to contract.'

"The housing regulations in effect at the University of Oklahoma result in completely depriving a student of freely contracting with whom he pleases for a place to live. If this restriction

upon the student is a valid exercise of the power conferred upon the Board of Regents to prescribe rules for admission to the University, it is absurd for the plaintiff to contend that the indirect effect deprives her of her liberty to contract, for the fact that regulatory law enacted under state power imposes hardship in individual cases, due to special circumstances or other factors, does not subject the law to constitutional objections.

"There is a presumption of the validity of state statutes or regulations passed by an administrative agency acting by authority delegated to the agency. If there is any state of facts which tends to support the regulatory measures and such measures are not clearly unreasonable or arbitrary, then the statute or regulation will be upheld as being constitutional. * * * The state has a decided interest in the education, well-being, morals, health, safety and convenience of its youth. When a situation arises where it becomes necessary to expend great sums for buildings to house students, it is within the power of the state acting through an administrative agency to provide such facilities, and when it is necessary for rules to be passed to provide payment for such buildings in furtherance of the object to be accomplished, such rules will be valid as a means accompanying the over-all policy of furnishing the needed facilities."

The Court pointed out that if there was any discrimination involved, and it refused to pass on that point, that it was against the students and not against the private home-owners such as Mrs. Pyeatte. Therefore, she was not in position to challenge the constitutionality of the statutes or regulations, but the Court did consider the issue of discrimination against Mrs. Pyeatte as a private householder duly approved by the University to keep students. In doing so, the Court found the regulations reasonable and that they did not deny plaintiff equal protection of the laws.

Since *Pyeatte* in 1952, it has been the consensus of State legislatures that college housing, dining and student life projects be paid for by students who benefit and not by the taxpayers of the State. By Act 619 of 1954, the Louisiana Legislature provided that its institutions of higher learning could construct any revenue producing facility, including dormitories, and only revenues from such facilities would be pledged for the payment of bonds given for financing such construction. Said Act, as amended, specifically authorizes the bond resolution to contain parietal rules:

"[The State could contract with the holder of bonds that it would assure] the maximum percentage of occupancy of a facility, [by] such parietal rules with reference to * * * residence in a facility and other pertinent matters, as may be deemed necessary by the Board, to assure the marketability of said bonds. * * *"

Thus far, we have seen that an effective system of higher education is one of the highest priority projects of both the federal and State governments. We also have seen that adequate housing, dining and student life facilities, for all prospective students, are agreed to be a necessary and most vital component of such an educational system. Thus, we are concerned hereafter only with whether a State's enactment of parietal rules to carry out the mission of higher education is permissible.

Plaintiffs allege that prior to 1969 the Board had never enacted parietal rules pursuant to the authorization therefor in the Legislature's bond issue resolutions. Plaintiffs assert that such parietal rules passed by the Board were prompted by an earlier law suit (Civil Action No. 15081 on the Docket of this Court) in September, 1969, by present plaintiffs contesting a Tech housing policy which required all unmarried students under twenty-one who did not live with parents or close relatives to live in

on-campus housing facilities.[4] Plaintiffs say it was after that suit that the Board adopted the contested resolutions here which require all students to live in university housing and then provide certain exemptions noted above. These exemptions, plaintiffs say, place them in the same position as they occupied before the present rules were enacted.

Defendants assert that plaintiffs' allegations are completely wrong in this respect. They point out that Tech has operated its housing, dining and student life facilities for many years without such rules as those contested. The record shows that Tech has had parietal rules in the form of a housing policy for many years. Defendants concede that plaintiffs are correct that the Tech Catalog for the 1968–69 school year contained language more directly calling to the students' attention on-campus residency requirements. This language was made necessary by actions of students in that the unprecedented migration throughout the Nation, by those able to afford it, to get away from the campus was beginning to pick up substantial momentum in Louisiana prior to the time of the publication of the 1968–69 Catalog.

This Court takes judicial notice of the fact that only a few years ago students were denied admission to certain campuses of Louisiana's higher educational institutions since there was an inadequate number of housing facilities to accommodate them. College presidents, State legislators, State education administrators, and others in position to do so were called upon by parents from throughout Louisiana to exert whatever influence they could to see that their son or daughter be given a room in a State institution's housing facility. The same situation no doubt existed throughout the country. The hue and cry went up for more and more housing so that all students would be afforded a decent place to live and eat at a cost they could afford. The States responded to this need and have provided as quickly and as best they could sufficient facilities to meet the demand. At present, however, and as noted, the trend is being reversed. Some students feel they can be more "free" living in an off-campus facility and that campus housing and dining facilities, for any number of reasons, are wrong for them. Educators have responded that there is more to learning than simply sitting in a classroom and that the living and learning centers, afforded by dormitory, eating, student life and other similar facilities are just as important as the classroom instruction itself. It is for this latter reason that defendants seek to uphold the parietal rules being contested:

"The principle of these cases is not confined to the supervised and ordained discussion which takes place in the classroom. The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. *Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. * * *"* Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). (Emphasis added.)

" * * * The classroom is peculiarily the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that *robust exchange of ideas* which discovers truth 'out of a multitude of

4. Plaintiffs in that suit alleged that they were denied equal protection under the law because they were discriminated against as a class in that (1) they were unmarried; (2) they were under twenty-one; and (3) they did not live with parents or close relatives. After the institu-

tion of that action, the Board passed the contested resolutions and plaintiffs were advised by defendants that their suit was then moot, since the contested resolutions here apply to all students. Disposition of that suit is made with this case.

tongues, [rather] than through any kind of authoritative selection.' " Keyishian v. Board of Regents of University of State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Éd.2d 629 (1967). (Emphasis added.)

■ Plaintiffs complain that broad application of parietal rules causes undue hardship on certain individuals who have specific problems that are not provided for in the rules themselves. This complaint is unwarranted in that the contested rules provide that any student having any sort of hardship, be it personal, financial, or otherwise, will, upon a proper showing, be exempt from the application of the rule.

Plaintiffs attack the resolutions as being unreasonable, arbitrary, and capricious. It is our appreciation that in the analysis of such an attack our first duty is to look at the benefit to be gained from upholding the regulations as opposed to the loss or deprivation suffered by those affected by the rules:

" * * * Though the wide leeway allowed the States by the Fourteenth Amendment to enact legislation that appears to affect similarly situated people differently, and the presumption of statutory validity that adheres thereto, admit of no settled formula, some basic guidelines have been firmly fixed. The distinctions drawn by a challenged statute [or regulations enacted thereunder] must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures [and regulatory bodies empowered by legislation to act] are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory [or regulatory] classifications will be set aside only if no grounds can be conceived to justify them. See McGowan v. Maryland, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393] (1961); Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552 [67 S.Ct. 910, 91 L.Ed. 1093] (1947); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61 [31 S.Ct. 337, 55 L.Ed. 369] (1911)." McDonald v. Board of Election, 394 U.S. 802, 808–809, 89 S.Ct. 1404, 1408, 22 L.Ed. 2d 739 (1969).

■ While it might be said that some students will gain very little from living under the parietal rules, it is just as certain that a great majority of students will gain incalculable benefits as a result of such rules. When one considers the fully adequate facilities that are provided by such rules and the thousands upon thousands of students throughout the Nation who are able to obtain a higher education only because of such facilities, reasonably priced, and thus the national objective and goal of achieving a better educated society is fulfilled more easily, certainly it cannot be contended seriously that the parietal rules are unreasonable, arbitrary, or capricious.

The foregoing is what may be styled a substantial and vital benefit to be enjoyed by all student generations. Yet, it is no more important than the personal benefit gained by each student who has the advantage of participating in the living and learning center environment made possible by the parietal rules. This is confirmed by the numerous, nationally prominent educators who supplied affidavits to that effect in this case.

■ Plaintiffs next would have us hold that through the exemption provisions the parietal rules deny students equal protection of the laws. They speak particularly of those provisions which require married students not living with their spouses to live in on-campus residence halls while not so requiring married students living with their spouses. This, plaintiffs say, is an unreasonable classification. In short answer to this, we do not believe this "exemption" is a "classification," since the class to which the rules speak is composed of all under-

graduate students. Even so, all members of the same class need not be treated completely equally.

"Judicial inquiry under the equal protection clause into areas of unequal treatment under law demands a standard of classification which is neither arbitrary nor creative of an invidious discrimination but reasonable when judged in light of the objectives of the legislation. See, e. g., Rinaldi v. Yeager, 1966, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577; McGowan v. Maryland, 1961, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393; Tigner v. Texas, 1940, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. See generally, Note, Developments in the Law—Equal Protection, 1969, 82 Harv.L.R.1065. Legislative bodies [and regulatory agencies created and empowered by them], however, are given rather wide latitude in their judgments as to the reasonableness of classifications." Briggs v. Kerrigan, 307 F.Supp. 295, 302 (E.Mass.1969).

Moreover, the exemption provision is not unreasonable since the only reason the married students living with spouses are exempt from the rule is that to have them live together with their spouses in the dormitory would certainly be unreasonable, given the contemporary method of housing single students in facilities occupied by only one sex. The contribution that a married person can give to and receive from the living center and other students is such that if his or her spouse is not residing with the student at the school's location, that student may be required to live on the campus.

 Plaintiffs also attack the other exemptions listed in the rules wherein such exemptions from on-campus residence requirement "may be granted by Proper Officials of the university." Plaintiffs object to the provisions of the resolution which state that exemptions may be granted to those full-time undergraduate students who would otherwise "suffer significant hardship or because of sufficient financial, medical, or other good and sound reasons shown or in the case of older students." As we have pointed out, exemptions due to certain hardships are certainly reasonable, not arbitrary, and in no way violate the equal protection clause. As to older students, examples of which are given as returning military veterans or certain types of previously married people, we think this type of exemption is within the realm of educational discretion which should not be interfered with by Courts having little knowledge of such matters, or expertise therein. If, for any reasonably related reason, educators determine that a certain type of person has nothing to gain or nothing to give regarding a living and learning center, then we believe this sort of problem should be left for solution to the schools involved.

 Plaintiffs next attack the resolution's order of priority in which it is stated certain groups of students are exempt. They say this is unreasonable and arbitrary favoritism, but we must disagree. The order of priority established in Schedule 45 of the Board's Resolution is effective only when on-campus space is not available. Certainly, an all-encompassing rule must have such exemptions since it is physically impossible for every student of the institution to live in campus housing facilities. The priority is based on academic seniority, with the underlying presumption being that the higher academic standing, i. e., senior, junior, etc., means that a student is more mature, and in his earlier college years, has already had the benefit of a living and learning center and would stand to gain less than those other students who have not had such a benefit. Regarding those students granted the number one priority to live off-campus in that they are residing with a parent or a close relative, this is only a common sense rule. For cer-

tainly students residing at home obtain many of the benefits as offered in a living and learning center, since it is recognized that the values sought to be achieved in such a center may be found in the type of atmosphere generated in family type living. Moreover, we would be less than candid if we did not recognize that it is far less costly for a student to live and eat with his family or close relatives than it is for him to live even in low-cost campus facilities. Many students are able to attend college *only* because they live at home. Moreover, as is often the case, a student who may be granted the exemption because he would live with his family and use its eating facilities is entitled to occupy dormitory facilities if he so chooses.

■■■ Plaintiffs' contention that the resolution contains a blanket and over-broad permission to school authorities to grant exemptions and is thus too flexible is unwarranted. Since the parietal rules *must* be general in nature, such a provision must be included so that the peculiar situations of each campus may be provided for in the general rule. Further, plaintiffs' assertion that the resolutions are vague and ambiguous is utterly without foundation. The Supreme Court has declared that

" * * * a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

The terms of the contested resolution are not vague at all; neither are they ambiguous; and good faith on the part of educators must be presumed unless the contrary is shown.

■■■ Plaintiffs strongly assert that the resolutions violate their right of privacy. We acknowledge that a student living in a communal type atmosphere is not afforded the same type of privacy in his daily living habits that he would be if he lived alone. However, we do not think the Fourth Amendment right of privacy is intended to be carried to the ultimate and such an unreasonable extreme as plaintiffs would have us do here. We are confident that State educational institutions will henceforth guarantee to occupants of dormitories the basic right to be free from unwarranted searches and intrusions into their private areas. In the event the institutions violate this principle, certainly the Courts will see to it that a student is secure in his papers and other private effects.

Plaintiffs point out that Moore v. Student Affairs Committee of Troy State University, 284 F.Supp. 725 (M.D.Ala. 1968), which dealt with a search of a student's dormitory room, established the fact that the boundary line between the right of the school to search and the right of a student to privacy,

" * * * must be a reasonable belief on the part of the college authorities that a student is using a dormitory room for a purpose which is illegal or which would otherwise seriously interfere with college discipline * *."

This, plaintiffs say, is different and less stringent than the traditional probable cause test utilized in determining the propriety of a search. The Court in *Moore* realized this but stated that a

" * * * reasonable right of inspection is necessary to the institution's performance of * * * [its fundamental] duty even though it may infringe on the outer boundaries of a dormitory student's Fourth Amendment rights * * * "

We believe this to be a proper statement of the law, but even if it is not, there is no reason to strike down the resolutions here on the claims of lack of right to privacy. If *Moore* is not a correct statement of the law, educational institutions will simply have to adhere to whatever standards the Courts may establish regarding searches.

We are cognizant of those cases which hold that a statutory classification based upon certain "suspect" criteria or which affect "fundamental rights" will be deemed to violate the equal protection clause unless justified by a "compelling" state interest. See, e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Even assuming that henceforth the stringent criteria enunciated in those cases will be applied when fundamental rights are involved, we do not feel that the complaints of plaintiffs are based on a denial of fundamental rights:

"In determining which rights are fundamental, judges are not left at large to decide cases in light of their personal and private notions. Rather they must look to the 'traditions and [collective] conscience of our people' to determine whether a principle is 'so rooted [there] * * * as to be ranked as fundamental.' Snyder v. Massachusetts, 291 U.S. 97, 105 [54 S.Ct. 330, 78 L.Ed. 674]. The inquiry is whether a right involved 'is of such a character that it cannot be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." * * *' Powell v. Alabama, 287 U.S. 45, 67 [53 S.Ct. 55, 77 L.Ed. 158]." Griswold v. Connecticut, 381 U.S. 479, 493, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510 (1965).

Certainly, virtually any facet of life could be classified as a fundamental thing and subject to the stricter test enunciated in the recent cases. We think the rights asserted by plaintiffs here are subject to the traditional test regarding equal protection standards:

"A legislative measure will be found to deny equal protection only if 'it is without any reasonable basis, and therefore is purely arbitrary.' Lindsley v. Natural Carbonic Gas Company, 220 U.S. 61, 78 [31 S.Ct. 337, 55 L.Ed. 369] (1911). It is not enough that the measure results incidentally 'in some inequality' or that it is not drawn 'with mathematical nicety,' ibid; the statutory classification must instead cause 'different treatment * * * so disparate, relative to the difference in classification, as to be wholly arbitrary.' Walters v. City of St. Louis, 347 U.S. 231, 237 [74 S.Ct. 505, 98 L.Ed. 660] (1954)." Shapiro, supra, Mr. Justice Harlan's dissent, 394 U.S. p. 662, 89 S.Ct. p. 1346.

 Even assuming, however, that a "fundamental" right is involved, we are confident there is a compelling State interest to assure that its college-age citizens are properly educated, and if housing, eating and student life facilities are a vital part of that process, as we now know they are, we hold there is no violation of the equal protection clause.

 Plaintiffs cite Shapiro v. Thompson, supra, for the proposition that a State may not use the power to restrict the freedom of movement of a person as a condition for the reception of benefits by that person. Shapiro was the welfare benefits case in which residency requirements were struck down on equal protection grounds. We simply do not think that case is analogous or at all pertinent here. Shapiro involved the basic right of a person to decide in which State he wanted to live and prohibited the chosen State from denying certain benefits to him as a result of his newly acquired domicile. Here, students may choose any educational institution for which they are qualified and their basic domicile is not altered by such choice. To follow plaintiffs' contention to its inescapable conclusion, a person could decide where he wanted to live and then require a State to provide education for him in that particular place. Moreover, a student's right to travel in and among the several States is in no way affected by the contested rules. See Shapiro, supra, footnote 21.

 Finally, plaintiffs say that the parietal rules violate the basic rights of the family and cite Griswold, supra, in support of that contention. In effect, plaintiffs say that if a parent desires that his child not live in dormitories

provided by the institution, he should not be made to do so. This is specious. In the first place, where sufficient hardship or compelling reason may be shown by the parent regarding his child and where he should live, a reasonable interpretation of the State's rules would allow such a student to live off-campus. On the other hand, a parent knows which parietal rules are in effect at the college to which he sends his child, and he should not be allowed to say that he wanted some of the benefits of the college or university for his child but not others. The benefits gained from association with the family are continued when that family happens to live in the same area in which the educational institution the child is attending is located near his home, and the student chooses to live with his family. Where the child goes to a distant institution, thereby making living with the family impossible, the family relationship necessarily and student is temporarily suspended, and the family must defer to the wisdom of the educators at the particular institution the child is attending.

In sum, education of its citizens is perhaps a State's most worthwhile and important function. In implementing that duty, the several States should be allowed wide latitude in determining the manner in which they are to operate. It certainly would be improper, indeed foolish, for this Court to say that all States must teach the same courses, that all educational institutions within one State must teach the same courses as the rest of the institutions, that each State must have a certain number of campuses for its students, and, yes, that it is improper for a State to adopt reasonable parietal rules requiring students to live and eat in an institution's facilities. If sound educational policies, as are shown here, dictate that the educational mission of the State is best carried out by providing for the great majority of student citizens of each State adequate housing and eating facilities at a cost which can be afforded by all students seeking entrance into

a particular university, then we do not think it is our place to decree otherwise.

Furthermore, and in the final analysis, each State, including Louisiana, has some State-owned educational facilities which have no dormitory accommodations for students. Moreover, some State institutions have fewer dormitory accommodations than others. If, in selecting the institution he wishes to attend, a student chooses one with dormitory and dining facilities, and parietal rules, he knows what he is choosing and may not be heard to complain.

It is argued that the parietal rules which we today uphold require students to live in dormitories *"under the guise* of having students receive a complete education through the 'living and learning experience' of campus communal living."* (Emphasis added.)

We simply do not feel the numerous outstanding educators, many of national renown, who submitted affidavits in this case to the effect that the living and learning center concept is a very valuable educational tool would say so unless this indeed was their sound, professional, expert opinion. It is a travesty of a sort even to infer they would be parties to any sort of disguised scheme to protect the interests of bondholders who bought the bonds within parietal covenants to protect their investments.

As already stated, the living and learning center concept was being followed here long prior to promulgation of the contested rules. Generation after generation of students have profited from such an experience. Only recently did this concept, formerly adhered to voluntarily, have to be placed in writing and made mandatory.

That defendants do strenuously defend the security feature of the bonds is only natural and justifiable. However, as pointed out earlier, the bonds are an obligation of each institution, not the taxpayer, and if revenues from its facilities are insufficient to service the debts, *all* students will be required to do so through higher fees or tuition payments,

thereby increasing the cost of education for *all*.

Plaintiffs find further fault in the resolutions by saying that all college and university authorities in Louisiana do not consider themselves bound by the rules. This is so because the Board resolutions are permissive, not mandatory. This feature allows educational institutions to achieve characteristics unique from their fellow schools and is only proper. We would not presume to say that all State schools *must* have the same facilities.

We have spoken of the effects of the contested resolutions on a student's right to travel, right of privacy and the relationship with his family. Insofar as his right of association is concerned, NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), cited by plaintiffs, struck down Virginia laws attempting to regulate activities of the legal profession in that State. The Supreme Court said such regulations prohibited lawful and orderly group activity of the NAACP. No such organizational activity is prohibited by the Tech regulations, and we are convinced that the cited case, and the other decisions relied upon by plaintiffs, and cited in the dissenting opinion by our brother here, are inapposite. In deed, most of these decisions are cited by us for exactly the opposite propositions.

If for any reason it is held that this proceeding is not one for a three-judge court, that conclusion does not affect the validity of the proceedings thus far or the continuing vitality of this decision, for the question of whether plaintiffs are entitled to the relief prayed for is to be considered as the action of the conventional single-judge district court.

We, therefore, grant defendants' motion for summary judgment.

EDWIN F. HUNTER, District Judge (concurring):

The threshold question is whether this proceeding is for a three-judge court under 28 U.S.C.A. § 2281. The Supreme Court of the United States recently reiterated and stressed its earlier holding that the three-judge court legislation is not a measure of broad social policy to be construed with liberality, but is rather an enactment technical in the strictest sense of the word to be applied as such. Mitchell v. Donovan, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970). As this case comes to us, it concerns not a statewide matter but rather a situation unique to Louisiana Tech at Ruston, Louisiana. The purpose of § 2281 is to prevent a single federal judge from being able to paralyze an entire policy on a statewide basis by issuing a broad injunctive order. The relief here sought, if justified, could in my opinion be granted without holding the State Board of Education's Resolution unconstitutional. See Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643; Dusch, et al v. Davis, et al, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656. I would dissolve the three-judge court and leave the question of whether plaintiffs are entitled to the relief sought for consideration and disposition by a single judge of the district court.

However, on the merits I agree with the result reached by Judge Dawkins, and accordingly concur in the result.

AINSWORTH, Circuit Judge (dissenting):

Judge Dawkins' opinion ably reflects the majority view. Nevertheless, I dissent because I believe the two 1969 resolutions of the Louisiana State Board of Education,[1] so-called parietal rules, which are the subject of this litigation and which require all unmarried, undergraduate students, regardless of age, in Louisiana State colleges to live in campus residence dormitories, are unconstitutional and violative of the First and Fourteenth Amendments of the United States Constitution.

Louisiana Tech, pursuant to the State Board's resolutions, in 1969 directed that all unmarried students under 21 years of

---

1. The Louisiana State Board of education has supervision of all higher educational institutions (except Louisiana State University). *See* La.Const. art. 12, § 7, ¶ 2.

age reside on campus in college residence halls, as a condition of being a student at this State college.[2] This was done by letter of the Dean of Students of Tech dated May 23, 1969, apparently to stem "the tide of migration from the campus by students" (defendants' supplemental brief, p. 1). Prior thereto student residence on campus for unmarried freshmen under 21 and all unmarried women under 21, only, had been required, and the balance were not regulated as to residence. The mandate of the school authorities to students that they live on campus, subject to dismissal as a penalty for noncompliance, is made under the guise of having students receive a complete education through the "living and learning experience" of campus communal living.[3] Said by defendants to be *incidental* to this purpose is the financial objective of servicing revenue bonds issued in connection with building the dormitories.

At oral argument defense counsel strenuously urged that the learning experience which students would receive by on-campus residence, was the principal objective of the State Board resolutions and the Louisiana Tech order to live on campus. Very little emphasis was placed on the proposition that on-campus residence was being required to provide sufficient revenue to service the dormitory bonds. In their supplemental brief, p. 10, defendants, however, argue:

"As to the allegation that bonds are the true issue, defendants have and do strenuously defend the security feature for the bonds seriously jeapor-

---

2. Though this suit is by plaintiffs on behalf of students at Louisiana Polytechnic Institute, it is nevertheless a class action and seeks an injunction against the enforcement of the State rule. The Louisiana State Board of Education resolutions attacked herein apply generally to the utilization of housing, dining, and student life facilities in the State of Louisiana as in the colleges and universities throughout the State under the jurisdiction of the Board. The Board's resolutions are State wide in application and do not pertain only to Louisiana Polytechnic Institute. It is appropriate, therefore, that this matter be considered by a three-judge court under the provisions of 28 U.S.C. § 2281. This is apparent from the language of the State Board resolution itself (Schedule 44, Section 2) which reads in pertinent part as follows:
"It is the policy and philosophy of higher education in the State of Louisiana as interpreted by this Board (subject to recognition by this Board of the differences that exist between the several colleges and universities and the need for reasonable flexibility in the administration thereof) that all unmarried full-time undergraduate students, regardless of age or whether or not emancipated, are required to live in on-campus residence halls as long as space is available * * *."
The Board's resolution (Schedule 44, Section 4) also makes it clear that the student is likewise required to use the dining halls and take his meals therein in connection with on-campus residence.

3. Use of the term "guise" is carefully considered and appropriate under the circumstances. The State Board of Education was not so much concerned with the welfare of the students and the purported benefits to be derived from communal life on campus. But it was primarily concerned "with the problem of not being able to raise sufficient revenues to pay off bond indebtedness on dormitories constructed on college campuses." The resolutions were adopted "as a fiscal measure to alleviate the dilemma faced by our colleges who needed dormitory revenues." That this is true is clearly and definitely established by the letter of Honorable Louis J. Michot, member of the Louisiana State Board of Education, dated July 17, 1970, to L. L. Richard, Lafayette, Louisiana, attached to the amicus brief of John W. Dupuis III, et al., which I include herewith as Appendix A. How it could be doubted that the purpose of the State Board resolutions was purely fiscal, in light of Board Member Michot's letter, is difficult for me to understand.
There are a number of affidavits from college administrators, predominantly non-residents of the State of Louisiana—none of whom purports to be familiar with the college dormitory situation in Louisiana or its financial needs—to the effect that communal living is an aid to education. These are irrelevant to the true issues when the Louisiana facts are known and as demonstrated by the candid admission of Board Member Michot that the Board resolutions were adopted as "a fiscal measure."

dized [sic] by the implications of this case, but such defense of bonds is only incidental to the more fundamental question of whether colleges and universities are to retain the right to provide reasonable rules in connection with their lawful purposes. * * * "

Plaintiffs contend that defendants should "tell it like it is" and admit that the real purpose of the State Board of Education resolutions and Louisiana Tech's order pursuant thereto, is to service the dormitory revenue bonds rather than to accord undergraduate students the living and learning experience of communal living. They point to the numerous student exemptions in the State Board's resolutions from the requirement of on-campus living, which the school authorities may exercise in an unlimited discretion to determine which students shall finally be required to live in the campus dormitories. The State Board's first resolution (Schedule 44) allows college officials to exempt undergraduate students from the campus residence requirement "A. In any case where it appears that a full time undergraduate student would otherwise suffer significant hardship or because of sufficient financial, medical *or other good and sound reason shown*." (Emphasis supplied.) Other exemptions are provided for in this schedule and in the second State Board resolution (Schedule 45), but the underscored exemption is so vague and general as to establish practically no standard at all for exemption.

At oral argument it also developed that the college authorities in the numerous Louisiana State colleges do not consider that they are necessarily bound by the two State Board of Education resolutions. Apparently each president decides for himself and his college whether he wishes to implement the State Board's resolutions by an appropriate order of the college itself. Defendants apparently concede as much in their supplemental brief (p. 2), wherein they state in part as follows:

"The matter of achieving *use* of facilities as required by the 'covenants' is left up to the individual institutions.

In the Louisiana system, as elsewhere, each college is different, with different traditions, philosophies and local conditions. There can be no absolutely uniform set of requirements or statement of housing policy that could be intelligently enacted by the Louisiana State Board of Education. In one college a lengthy housing policy is deemed helpful. At another college, the proper officials may only include a brief reference. The flexibility necessarily required for the wide variation in situations in which institutions serve and the individual educators responsible, necessarily dictates that no uniform language is intended nor specified by parietal rules bond covenants. Louisiana Polytechnic has successfully operated within this context."

In my view the State Board of Education resolutions and the Louisiana Tech mandate to undergraduates to live on campus violate the First Amendment right of students to come and go as they please, associate with whomever they desire, and live with whom they choose. Their right of privacy is also infringed. *See* Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); Keyishian v. Board of Regents of U. of St. of N. Y., 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); and N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). As to those students under 21 years of age who are still minors and therefore under parental authority, the mandates are an unwarranted interference with the right of parents to decide whether they wish their college children to live in campus dormitories or off campus. Communal life for students is therefore imposed by a State agency, and is involuntary. Students do not abandon their constitutional rights as American citizens when they

enter the portals of State colleges. Tinker v. Des Moines Independent Com. Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). However, the resolutions of the State Board attempt to deprive students of fundamental rights of freedom of association and equal protection of the laws. It should be a student's decision or a parent's decision as to whether a student will live on campus or off campus.[4] This right should not be subject to the whim or caprice of the school officials as to whether an exemption may be granted, even if the present policy relative to exemption is apparently liberal.

The numerous exemptions listed from the on-campus residence requirement and the unlimited right at the discretion of college officials to grant exemptions, deny plaintiffs the equal protection of the laws in violation of the Fourteenth Amendment—some are favored with exemption, some are not.

The fact that students or parents on behalf of students, choose to enroll in a State college where parietal rules prevail, cannot bind them, without their consent, to accept unconstitutional regulations pertaining to the place of residence of such students. After all these are public, State-supported schools, and it is the right and privilege of students to select the college they wish to attend without being ipso facto bound to every unreasonable regulation which school authorities may wish to impose on their extra-academic activities. *See* Dixon v. Alabama State Board of Education, 5 Cir., 1961, 294 F.2d 150, 156, cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed. 2d 193.

The voluntary nature of campus residence in the past has been the Louisiana tradition. Prior to 1969 the State Board had never enacted any parietal rules. Now to require on-campus residence by State Board of Education resolutions and college order is to change a policy which has long prevailed in Louisiana college life. The 1951 case of Pyeatte v. Board of Regents of University of Oklahoma, W.D.Okla., 1951, 102 F.Supp. 407, affirmed 342 U.S. 936, 72 S.Ct. 567, 96 L.Ed. 696 (1952), cited by defendants, is not apposite since the Court held that the plaintiff, a boarding house owner, was without standing to contest a University of Oklahoma compulsory rule requiring students to live in campus dormitories. Language tending to support defendants' position is clearly dicta. I do not believe that the Louisiana State Board of Education or Louisiana Tech may validly enforce resolutions or orders that all unmarried, undergraduate students mandatorily reside on campus as a condition of attendance at a State Col-

4. In this context plaintiffs state in their brief (and I am in agreement) that
"The effect of the resolutions upon the class to which the plaintiffs belong is complex and present both general and individual dilemmas. Obviously, the additional financial burden placed upon the students in the classification contemplated by the resolutions will make it more difficult for some and impossible for others to pursue their education at Louisiana Tech. It is equally apparent that most, if not all students so disposed, could continue to negotiate off-campus room and board arrangements in an amount less than the current rates for on-campus room and board. Moreover, the on-campus rates are contracted for on a semester basis and each student must rent the room for the full semester. Rent must be paid for the full semester unless the student obtains special permission from the business manager to pay the amount in two equal installments; no refund is made for meals missed for less than a continuous period of seven days, and then only if the student also is absent from classes with an official excuse.
"Individual cases of hardship and injury are presented by situations whereby: students with medical and/or dietary problems; students who are gainfully employed in off-campus employment requiring on-the-job residency; older students and others who are unable to study in a communal atmosphere; students who have purchased house trailers or other housing accommodations; advanced students majoring in education participating in supervised directed teaching in off-campus schools located a great distance from Louisiana Tech, et cetera."
Plaintiffs' brief, p. 4.

lege, whether they wish to do so or not and whether their parents desire them to or not. I therefore dissent from the majority opinion which declines to hold the State Board of Education resolutions unconstitutional.

## APPENDIX

### STATE OF LOUISIANA
Seal BOARD OF EDUCATION
### BATON ROUGE 70804

LOUIS J. MICHOT SECOND
P. O. Box 52169 PUBLIC SERVICE COMMISSION
LAFAYETTE, LOUISIANA 70501 DISTRICT

July 17, 1970

Mr. L. L. Richard
Richard Dormitory
1416 Johnston Street
Lafayette, Louisiana

Dear Mr. Richard:

As a member of the Louisiana State Board of Education, I am aware of the resolutions adopted by said Board pertaining to requirements that students reside in ON-CAMPUS DORMITORIES as more fully set forth in these resolutions.

Even though the trend across the United States is for students to live off-campus, the colleges in the State of Louisiana were faced with the problem of not being able to raise sufficient revenues to pay off bond indebtedness on dormitories constructed on college campuses for the reason that insufficient numbers of students resided in college dormitories, many of whom preferred living in private dormitories off campus.

The resolutions in question were designed to meet the financial crisis that would face the colleges where these dormitories were located because of the lack of occupancy, and to obtain necessary funds to retire said bonds, the said resolutions were adopted to require students to reside therein, which I might mention was a requirement in the bond resolution when the various bond issues were sold to investors.

As I mentioned to you, the Board had to effect policies assuring on-campus residence in spite of the fact that the trend has been for students to live off campus not only in the State of Louisiana but all over the nation. I can certainly sympathize and appreciate the problem that our state colleges face; however, clearly I recognize that the resolutions were adopted as a fiscal measure to alleviate the dilemma faced by our colleges who needed dormitory revenues and, of course, the Louisiana State Board of Education was required to honor its obligation by adopting said resolutions to comply with the abovesaid bond resolution requirements.

Yours very truly,

(s) Louis J. Michot, Member
Louisiana State Board of Education
LJM/al