Gail PROSTROLLO and Lynn Severson for themselves and in behalf of all others similarly situated, Plaintiffs,

v.

The UNIVERSITY OF SOUTH DAKOTA et al., Defendants.

No. CIV 73–4063.

United States District Court, D. South Dakota, S. D.

Jan. 21, 1974.

South Dakota, a four year, co-educational institution located at Vermillion, South Dakota, and under the general supervision and control of the South Dakota Board of Regents. Plaintiffs seek to have declared unconstitutional and to enjoin enforcement of the University of South Dakota Housing Regulation which requires, with certain exceptions, that all single freshman and sophomore undergraduate students live in University residence halls. It is claimed that this regulation denies plaintiffs 1) their right of personal privacy without due process of law, 2) the equal protection of the laws, and 3) their right to be secure in their persons, house, papers and effects against unreasonable searches and seizures.

This action arises under 42 U.S. C. Sec. 1983. Federal jurisdiction is grounded upon 28 U.S.C. Sec. 1343. Plaintiffs action for declaratory relief is authorized by 28 U.S.C. 2201 and 2202.[1]

Based upon the following discussion, this Court concludes that the contested housing regulation, as applied and implemented at the University of South Dakota, establishes an unreasonable and arbitrary classification, having little or no relation to the objective sought to be accomplished by the regulation, and thereby denies plaintiffs and members of their class the equal protection of the laws under the Fourteenth Amendment to the Constitution.

*Findings of Fact*

The primary factual conclusion drawn from the evidence is that the purpose behind the regulation is financial; that is, the object which the regulation seeks to promote is the retirement of bond indebtedness incurred in constructing the dormitories. Assertions to the contrary, made specifically by University President Richard Bowen in his affidavit and deposition, that the purpose behind the regulation is educational strikes the Court as a mere afterthought, asserted

Michael B. Crew, Vermillion, S. D., for the plaintiffs.

Carleton R. Hoy, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for the defendants.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

Plaintiffs, and the class they represent, are students at The University of

---

1. A three-judge court was not requested and is not required in this case as the contested regulation is applicable only to The University of South Dakota.

because of previous legal decisions and unsupported by any concrete evidence in the record.

It is obvious from the evidence presented that the concern of the Board of Regents is financial. Quoting from the deposition of Dr. Richard Gibb, South Dakota Commissioner of Higher Education:

> The Board of Regents sells bonds to finance the construction of dormitories. Each president is expected to take whatever steps are necessary to see to it the bond indebtedness is paid off. The Board does not have an overall policy for all campuses. They have a policy that says indebtedness must be repaid. p. 4

Similar statements are found throughout Dr. Gibb's deposition. Commissioner Gibb also stated that a resolution passed by the Board of Regents in 1964 was typical of resolutions passed with construction of each new dormitory project. Deposition, p. 9. That resolution provides, in part:

> 3. That to the extent any surplus space or facilities shall ever become available in the said Project and related facilities while any of the Bonds remain outstanding and unpaid, it shall be the duty of the officers of University of South Dakota to enforce a rule requiring occupancy and use, to the extent practicable, of said project and related facilities by students attending University of South Dakota and this provision shall be considered as a rule for guidance of said officers.

Legislative authorization for the Regents to establish parietals can be found in S.D.C.L. 13–51A–38, adopted in 1971 and stating:

> *Parietal rules.*—In connection with the issuance of any bonds under this chapter, and in order to secure the payment of any such bonds and the interest thereon, the board shall have the power for each such institution to make and enforce and agree to make and enforce parietal rules that shall ensure the use of any project to the maximum extent to which such project is capable of serving students, staff members and others using or being served by, or having the right to use or the right to be served by, or to operate, any project.

That the above section is found in the Compiled Laws Chapter entitled "Board of Regents Revenue Bonds" is further indication of the source and purpose of the parietal regulation in question. University Business Manager, Roy J. Tiede, reinforces the conclusion of financial purpose behind the regulation by statements made in his affidavit to the effect that the Board of Regents has agreed to enforce rules and regulations that will assure maximum dorm occupancy so long as any bonds are outstanding or unpaid.

This Court recognizes there are valid educational objectives behind the *construction* of dormitories. By providing housing so that more students can attend the University than if such housing were not available, the University can increase its enrollment and its resources, and consequently offer better educational facilities and opportunities to its students, thereby fulfilling its purpose of

> [providing] the best and most efficient means of imparting to young men and women on equal terms a liberal education . . . S.D.C.L. 13–57–2.

While the objective behind dorm construction may be educational, the objective behind the regulation requiring freshmen and sophomores to reside in dormitories is to retire bond indebtedness and it is unreasonable and arbitrary to make only some students pay for a benefit received by all students.

President Bowen states in his affidavit that

> it is the responsibility of a state institution of higher education to provide on-campus dining and housing facilities and related activities to broaden and enrich the life of the individual student; that the involvement of a student in this kind of relationship

will enhance his formal education by promoting personal and social development in connection with his academic progress.

Certainly, as I discussed above, the *construction* of housing facilities produces certain educational benefits, but there is *no* concrete evidence in the existing record, which is decidedly threadbare, that the experience of dorm *living* either "broadens and enriches" a student's life, or that it enhances his formal education in the area of personal and social development. On the contrary, the only specific examples given of opportunities available to dorm students, that is, counseling, forums, and intramural sports, are also available to non-dormitory students. See deposition of Aaron L. Schnell, Director of Resident Services, p. 42–46. And, in fact, when asked by deposition what advice he relied on to come to the conclusion stated in his affidavit, President Bowen answered "My own, my own feelings, my own sensitivities toward the matter, people around me." Such a statement is unconvincing in view of the lack of any supportive evidence such as studies or other data demonstrating any educational objective accomplished by the regulation, and in view of the substantial evidence portraying the regulation as a financial guarantee for paying off the bonds.

A review of past housing regulations submitted as exhibits shows that over the years the trend has been to equalize requirements for men and women students, and generally to ease the requirement that students live in the dorms. President Bowen explains the policy behind such changes as an attempt by the University "to remove itself from situations of forcing students into housing against their choosing when satisfactory alternatives are available." But forcing students is just what is being done here, with no satisfactory explanation of how freshmen and sophomores can benefit educationally any more than those students not required to live in a dorm. The dormitory regulation belies and contradicts President Bowen's statement that "We have been rather consistent in recognizing we are dealing with an adult group, being responsible for their own actions to the greatest degree possible."

Further evidence that the purpose behind the regulation in question is not educational is the fact that exemptions (Vermillion residents and commuters living with parents, fraternity and sorority members) are granted on a financial basis, *not* on any grounds that those students exempted would stand to benefit less from any "broadening and enriching" educational experience than plaintiffs. See Schnell deposition, p. 49–50.

### Conclusions of Law

■ Plaintiffs have the burden of showing that no rational connection exists between the class established by the regulation (freshmen and sophomores not exempted) and the purpose behind the regulation (retirement of bond indebtedness). This showing has been made since the record contains clear evidence that the objective sought to be accomplished by the regulation is primarily financial rather than educational. And, even assuming, arguendo, that the purpose behind the regulation *were* educational, there is not one shred of evidence that the particular class of freshman and sophomore students would benefit educationally any more than those students who are not required to live in dorms. Such irrational classification is at the heart of all equal protection decisions. In order to pass constitutional muster, a classification

> must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971), citing F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

■ This court concludes that the object of the contested regulation is to insure retirement of the bond indebtedness, and that making only certain freshmen and sophomores pay by living in the dorms is arbitrary and unreasonable, contrary to equal protection mandates. As the Court said in Mollere et al. v. Southeastern Louisiana College et al., 304 F.Supp. 826 (D.C.La.1969),

> Absent the special educational considerations previously mentioned the support of the housing system is an obligation which should fall on all students equally just as does, for example, tuition. Since the obligation is essentially *monetary*, then all must pay or none. To select a group less-than-all, to fulfill an obligation which should fall equally on all, is a violation of equal protection no matter how the group is selected. p. 828.

If the University wishes to maintain high dormitory occupancy, perhaps the answer lies in making dorm living more attractive to students so that there are adequate volunteer residents. Whatever their course may be, it cannot include forcing one group of students to bear the financial burden of paying off dormitories which were built for the benefit of all students and indeed, the entire University.

### Pratz Distinguished

Defendants feel that the case of Pratz v. Louisiana Polytechnic Institute, 316 F.Supp. 872 (W.D.La.1970), affirmed 401 U.S. 1004, 91 S.Ct. 1252, 28 L.Ed.2d 541 (1971), is controlling on all the issues in this case and should be determinative of the outcome because it was affirmed, without opinion, by the United States Supreme Court. I do not agree for the following reasons:

1. The federal district court in Poynter v. Drevdahl, 359 F.Supp. 1137 (W.D.Mich.1972), although deciding against the plaintiff students, determined that the summary affirmance of *Pratz* by the Supreme Court, though highly persuasive, was not binding for two reasons, one of which is certainly applicable in this case also:

2. The absence of any written opinion accompanying the affirmance leaves uncertain the exact basis upon which the decision to affirm was based. This is particularly true when the motion (for summary judgment) itself was based upon Pyeatte v. Board of Regents, 102 F.Supp. 407 (W.D.Okl.1951), affirmed 342 U.S. 936, 72 S.Ct. 567, 96 L.Ed. 696 (1952), which primarily ruled that such parietal rules did not violate the constitutional rights of a non-student owner of private housing, an issue which does not exist here.

2. A further distinction is provided by Judge Dawkins, the same judge who wrote the *Pratz* opinion, in his later decision of Cooper v. Nix, 343 F.Supp. 1101 (W.D.La.1972). Judge Dawkins there referred to *Pratz* as an attempted

> broadside and "shotgun" attack upon the entire concept of reasonable parietal rules. The plaintiffs there argued that *no* parietal rules were valid, relying primarily on the First Amendment. *Cooper, supra* at 1104.

In this case only that parietal concerning forced dormitory residence of a certain class of students is challenged as unconstitutional as applied and implemented at The University of South Dakota.

3. Finally, and most significantly, the holding in *Pratz* was based upon a factual finding by the court that the purpose behind the challenged parietals at LSU was educational. In this case, the factual finding has been made that the regulation in question is in effect and enforced primarily to accomplish the financial objective of retiring bond indebtedness on the dorms. Statements of educational purpose are unconvincing, and unsupported by the evidence.

Having decided the case under traditional equal protection standards, this Court makes no determination of whether a fundamental interest is involved, or whether there was any deprivation of

the Constitutional right to privacy, or whether there were any Fourth Amendment infringements.

Attorney's fees are denied for those reasons stated by this Court in Baltic Independent School District v. South Dakota High School Activities Association, 362 F.Supp. 780, 786 (1973).

Counsel for the plaintiffs are directed to prepare a judgment in accordance with this memorandum decision for the signature of the Court, with the stipulation that a stay will be granted for 30 days, thereby allowing the defendants time to file an appeal if they so desire.