**Loys A. MOLLERE, on behalf of her minor daughter, Bertha Jane Mollere, et al., Plaintiffs,**

v.

**SOUTHEASTERN LOUISIANA COLLEGE, Dr. Clea E. Parker and the Louisiana State Board of Education, Defendants.**

**Civ. A. 69–2037.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 15, 1969.

John P. Nelson, New Orleans, La., for plaintiffs.

William P. Schuler, New Orleans, La., Thomas McFerrin, Baton Rouge, La., for defendants.

CASSIBRY, District Judge:

This case poses the question whether state college girls under the age of 21 can constitutionally be required to pay more than other students to support the College's housing system.

The plaintiffs are upperclass women under 21 who have attended and who plan to continue to attend Southeastern Louisiana College located in Hammond, Louisiana. This is a four-year coeducational state college under the general direction and supervision of the Louis-

iana State Board of Education. Many on-campus dormitories have been constructed in recent years with federal financing. A portion of the rent paid by students is used to meet the dormitory debt obligation to the federal government. In recent years male students have used the dormitories in diminishing numbers so that the State Board of Education and College officials have become concerned about meeting the principal and interest obligations to the government. As a result the State Board of Education recently resolved that Southeastern Louisiana College require a sufficient number of students to live in the dormitories to meet the payments to the United States. In compliance with this resolution Southeastern Louisiana College promulgated a rule to be effective in the 1969–1970 academic year which, among other things, required unmarried women students under 21 not living with their parents or a close relative, to live in campus residence halls unless exception was granted by the Dean of Women. At the same time other rules required that any freshman male student, not living with his parents or a close relative, live on-campus unless exception was granted by the Dean of Men. Plaintiffs have not questioned the legality of requiring freshman boys and girls to live on-campus and both sides have agreed that that is not in issue in this case. As a matter of fact, no evidence was taken on that issue.

It is undisputed that the College's sole reason for requiring that women under 21 and freshmen men live in college residence halls was to meet the financial obligations which arose out of the construction of those dormitories. When the Court specifically asked Mrs. Parker, the Dean of Women, the reason for the requirement, she testified that the sole and only reason was to increase the revenue of the housing system. Indeed, when she was asked why this particular category of students was chosen she replied that the girls in this group together with the freshman boys comprised the precise number needed to fill the dormitory vacancies.[1] This was confirmed by the Auditor of the University, and their testimony was not contradicted by any other College official.

For purposes of this case it might be conceded that a state university may require all or certain categories of students to live on-campus in order to promote the education of those students. It might reasonably be felt that on-campus living brings students together, promotes discussion and intellectual exchange, and so on. It might also be reasonable for a university to require on-campus living of students in order that the university may more closely supervise them and protect their welfare as *parens patriae* when they are away from home. The sole issue in this case, on the other hand, is whether the College may require a certain group of students to live on-campus, not for the welfare of the students themselves but simply to increase the revenue of the housing system. More specifically, can the College require girls under 21 to live on-campus while allowing others to live off-campus simply to meet expenses? Is this a valid classification under the Equal Protection Doctrine? I have decided that it is not; in effect, it is a requirement that some students must pay while others need not. Why should the particular students who are the plaintiffs in this case bear any more of the financial obligation of the College housing system than any of their other fellow students? The burden of expense is falling on some but not on others. The sole reason offered by the College is that the plaintiffs comprised the precise number of students required to fill existing vacancies. If students with black eyes had filled the bill—i. e. comprised the desired number—they would have done

---

1. A hypothetical case may help to illustrate the arbitrariness of such a selection. Suppose there are 50 million adult male whites in the United States and 2 million adult male blacks. Supposing that the Army required precisely 2 million men it could hardly draft all the blacks and none of the whites.

equally well, so far as the evidence indicates, to satisfy the College's need. This is the type of irrational discrimination impermissible under the Fourteenth Amendment. Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); Griffin v. Tatum, 300 F.Supp. 60 (M.D. Ala.1969); Breen v. Kahl, 296 F.Supp. 702 (W.D.Wis.1969). Absent the special educational considerations previously mentioned the support of the housing system is an obligation which should fall on all students equally just as does, for example, tuition. Since the obligation is essentially *monetary*, then all must pay or none. To select a group less-than-all, to fulfill an obligation which should fall equally on all, is a violation of equal protection no matter how the group is selected.[2]

2. This case neither raises nor decides the issue of whether, apart from the equal protection issue, it is a valid exercise of a state university's power to dictate to a student where he shall live, not for reasons having anything to do with the student's welfare or the educational appropriateness of the place chosen, but simply for the purpose of increasing revenue to support the university housing system. This question has neither been briefed nor argued by the parties. The Court might simply note, however, that the question is not entirely obvious. Suppose, for example, that the State required poor people to live in public housing in order to finance that housing? Just as the State might claim that such a measure was designed ultimately to benefit poor people by providing housing for the future, so the state university might claim that requiring students to live in dormitories in order to finance them was ultimately for the benefit of students in the future. Do "students" lose the fundamental rights that adults normally possess simply because they are students?. See Tinker v. Des Moines Independent Community School District et al., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). See also Goldstein, The Scope and Sources of School Board Authority to Regulate Student Conduct and Status: A Nonconstitutional Analysis, 117 U.Pa. L.Rev. 373 (1969).