Susan **POYNTER** et al., Plaintiffs,

v.

Walter **DREVDAHL** et al., Defendants.

File M–31–71 CA.

United States District Court,
W. D. Michigan N. D. at Marquette.

Jan. 11, 1972.

William S. Easton, U. P. Legal Services, Inc., Marquette, Mich., for plaintiffs.

Charles L. Burleigh, Jr., Miller, Canfield, Paddock & Stone, Detroit, Mich., for defendants.

## OPINION

ENGEL, District Judge.

This case presents a controversy concerning the constitutionality of certain parietal regulations currently in force at Northern Michigan University.

Plaintiffs instituted this class action as students of Northern Michigan University against the named defendants as members of the Board of Control of that University. Northern is a constitutional institution of higher learning.[1] The defendants are members of a board appointed by the Governor of Michigan and have general supervision of the University.[2] Over the years, undergraduate enrollments have increased at Northern and to keep pace with this influx, dormitories were constructed to meet student housing requirements.[3] On August 15, 1970, the defendant members of the Board of Control adopted the following housing requirement:

"*Housing Requirement:* (Penalty: not less than warning probation; not more than financial restitution for the amount of room and board for the period of violation and/or expulsion) All single undergraduate students shall live in University residence halls while enrolled for classes at Northern; provided, however, that this requirement shall not apply to those undergraduates who are:

1. 23 years of age or older on or before the last official day of registration for the Fall Semester,

or who are

2. residing with parents or legal guardian in the greater Marquette area (defined as those areas included in the Marquette telephone directory listings)."

In conjunction with this requirement, the "Off-Campus Housing Committee" was established and given the power to exempt students from the general housing requirement on the basis of the following criteria:

"CRITERIA IN GENERAL PRIORITY ORDER:

*Medical:* Conditions which are verified by the University Health Center or Counseling Center and which it is agreed would most likely impair the student's health if he were required to live in University residence halls.

*Financial:* Circumstances which would prevent a student from attending Northern for financial reasons if required to live on campus. Preference will be given to seniors and then juniors.

*Relative:* Circumstances which would financially hinder a student from attending Northern without living with a relative who is contributing at least in part to their room and board expenses. The relative must be a brother, sister, grandparent, aunt or uncle.

*Commuter:* Circumstances which would require the student to live with his parents or legal guardians outside the greater Marquette area.

---

1. Michigan Constitution of 1963 Art. VIII, §§ 4 and 6.

2. Michigan Constitution of 1963 Art. VIII, § 6.

3. Paragraph 2 of affidavit of Allan Niemi, Ph.D., Vice President for Student Affairs.

Other situations which are not covered by any of the above will be considered depending on the individual circumstances of the case."

Plaintiffs seek to have the court declare invalid and enjoin enforcement of the cited University housing requirement and supporting criteria on the grounds that they are violative of the rights of plaintiffs and the class they represent under the First, Fifth, Ninth and Fourteenth Amendments of the United States Constitution, the Civil Rights Act of 1964, and the Department of Housing and Urban Development Rules and Regulations. Plaintiffs claim that the contested regulations violate their constitutional rights of travel, education, privacy, association, procedural due process and equal protection of the law.

Without dismissing their other claims and arguments, the position of the plaintiffs is well summarized at page two of their brief:

"The reason for the housing requirement is at the very heart of Plaintiffs' complaint of constitutional violation. If the reason is completely fiscal to protect the University's fiscal obligations, then under the authority of Mollere v. Southeastern Louisiana College, 304 F.Supp. 826 (E.D.La. 1969) that housing requirement violates the Fourteenth Amendment. If, on the other hand, the University has and can now prove sufficient educational value for the requirement, under the analysis of the *Pratz* case, that requirement may not be constitutionally offensive."

Plaintiffs basically claim that they have a right to prove upon trial of this case that the real reason for the housing requirement is to protect the University's fiscal obligation and that they have a right to trial on the issue of whether there is sufficient educational value to warrant such a rule. Corollary thereto, they claim the right to judgment and relief if such sufficient educational value is not shown on the basis that *Mollere*, supra, makes such rules otherwise arbitrary, discriminatory, and violative of plaintiffs' federally guaranteed constitutional rights.

Defendants have moved for summary judgment under F.R.Civ.P. 56 on the basis that "there is no genuine issue as to any material fact herein and Defendants are entitled to judgment as a matter of law."[4]

It is not the function of this court to decide whether in its own judgment the regulations and policy complained of are wise or unwise, or whether there is a better way of handling the question of student housing, or who may have the edge in any philosophical differences which may exist. The sole question for decision is whether there has been a violation of rights guaranteed under the Constitution of the United States, thus giving rise to the exercise of jurisdiction by this court under 28 U.S.C. §§ 1343(3) and (4), 2201 and 2202, and 42 U.S.C. § 1983.

The summary judgment procedure serves a beneficial purpose in enabling courts to dispose of many cases without the time-consuming and expensive trial process where the undisputed and true facts establish, as a matter of law, that no trial could result in a judgment favorable to the plaintiff.

Common sense and existing case law, however, dictate that "summary judgment should be granted with caution and only where the movant has established the nonexistence of any genuine issue of fact. That showing made must be construed in the light most favorable to the party opposing the summary judgment and that party should be accorded all favorable inferences that may be deduced from the showing. The reason for this being that a party should not be de-

---

4. F.R.C.P. 56(c) provides in part:
 "The (summary) judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

prived of an adequate opportunity to fully develop his case by witnesses in a trial where the issues involved make such procedure the appropriate one." Rogers v. Peabody Coal Co., 342 F.2d 749, 751 (6th Cir. 1965).

Thus, the court must examine the pleadings and, in this case, the respective affidavits submitted on behalf of the parties to determine whether there exists a genuine issue as to any material fact and if there is, the motion must be denied.[5]

In opposition to the motion, the plaintiffs set forth four specific factual allegations on their brief which are not rebutted by proof submitted on behalf of defendants. These allegations are as follows:

"(1) That some of the class of Plaintiffs have applied for off-campus housing and have been denied exceptions by the Off-Campus Housing Committee. (Para. 4)

(2) The reasons given Plaintiffs by Defendants for the housing requirement was to enable them to meet their bond obligation. (Para. 7)

(3) That it is a financial hardship for some of the class to pay the University room and board when they could obtain less expensive living accommodations off-campus. (Para. 9)

(4) That the living areas in the rooms in which students have been housed, at three to a room, is approximately 1,300 cubic feet. (Para. 24)"

The above allegations are generally supported by affidavits filed by plaintiff students and those affidavits are not specifically controverted by defendants. In fact, defendants have stipulated as to (4) above.

On the other hand, the defendants have also submitted affidavits which are not specifically controverted by any opposing affidavits filed by plaintiffs.

The affidavit of John N. Gardner, Assistant Director of Housing of Northern Michigan University, states that a total of 530 students applied for permission to live off campus at the beginning of the 1971 Fall semester. Of these applications 431 were granted and 99 denied. Of the 431 applications approved, financial reasons accounted for 133; medical, 66; personal, 55; relative, 34; commuter, 63; marriage, 44; part-time, 30, and special work arrangement, 6 students. On the basis of age, two students of the age of 17 years were granted permission; 16 of the age of 18 years; 80 of the age of 19 years; 105 of the age of 20 years; 109 of the age of 21 years; 91 of the age of 22 years. By class, the number of students approved for off campus housing ranged from 35 for freshmen to 182 for seniors. It was Mr. Gardner's affidavit further that of those who had requested permission, 20 were, as of October 15, 1971, unable to find suitable living accommodations in the Marquette area and thus were still living in University residence halls. The specific names of those students were also attached to the affidavit.

The affidavit of Dr. Allan L. Niemi, Vice President for Student Affairs of the University, alleges that there are twelve student dormitories located on the Northern Michigan University campus, opened for occupancy during the period from and including 1949 to 1967. His affidavit further contains enrollment statistics for the University which discloses a rise in enrollment from 1,022 in September 1949 to 7,356 in September 1970. It further alleges that "prior to September 1967, student housing facilities at Northern Michigan University were inadequate to keep pace with the demand."

Paragraph 3 of Dr. Niemi's affidavit alleges that

"in constructing and operating its campus dormitories, it has been the

5. F.R.C.P. 56(c) provides in part:
"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as other provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

policy of Northern Michigan University to provide reasonably priced living facilities convenient to campus for as much of the student population as possible, and to create an environment in which students can live and work together in a community of scholarship."

Dr. Niemi's affidavit further alleges that although the University permits undergraduate students to live with a parent or guardian in the greater Marquette area, this policy has not been extended to allow students to live with married brothers and sisters for it would be less likely that the student would receive adequate living and working accommodations.

With respect to the policy exempting students above the age of 23 from the parietal rules during the academic year 1970 to 1971, Dr. Niemi cites as reasons that the proportion of the student body under 23 years of age is approximately equal to the capacity of the University's campus dormitories, and that more mature students, such as returning veterans and housewives continuing their education, will thereby be excused from living in the dormitories.

The well pleaded facts in the complaint, the four specific factual allegations referred to above and the uncontroverted allegations in the affidavits submitted by plaintiff must be accepted as true and any inferences arising from them must be construed in plaintiffs' favor. At the same time, the court is entitled under the Rule to accept as also true those uncontroverted factual allegations submitted on behalf of defendants by Mr. Gardner and Dr. Niemi.

While many authorities are cited under the general constitutional issues raised in the pleadings, case law on the specific subject focuses upon two federal decisions, both arising out of the State of Louisiana. Plaintiffs claim support for their position in Mollere v. Southeastern Louisiana College, supra. In that case the District Judge ruled that a regulation making dormitory residence mandatory for all women students under age 21 was violative of those students' rights where the sole reason advanced for the regulation was to enable the University to meet financial obligations that arose out of the construction of the dormitories.

Defendants place reliance upon the majority decision of a three-judge panel in Pratz v. Louisiana Polytechnic Institute, 316 F.Supp. 872 (1970). There summary judgment in favor of defendant college was rendered and on appeal, the college's motion for affirmance was granted by the United States Supreme Court without comment, 401 U.S. 1004, 91 S.Ct. 1252, 28 L.Ed.2d 541 (1971). Defendants here claim that the summary affirmance makes the ruling in *Pratz* binding upon this court. While closely analogous in many aspects with the facts of this case, the court determines that the summary affirmance of *Pratz*, though highly persuasive, is not binding upon this court for two reasons:

1. The defendant's arguments in *Pratz* were much more fully supported by uncontroverted affidavits than is the case here.

2. The absence of any written opinion accompanying the affirmance leaves uncertain the exact basis upon which the decision to affirm was based. This is particularly true when the motion itself was based upon Pyeatte v. Board of Regents, 102 F.Supp. 407 (W.D.Okl.1951), affirmed 342 U.S. 936, 72 S.Ct. 567, 96 L.Ed. 696 (1952), which primarily ruled that such parietal rules did not violate the constitutional rights of a non-student owner of private housing, an issue which does not exist here.

The authority of a state-supported institution of higher education to construct dormitories for student housing is not challenged by plaintiffs, nor can it be. M.S.A. § 15.1120(1), M.C.L.A. § 390.551, provides for the establishment of boards of control. The statutory authority in a board of control to erect residence halls and to obligate itself for the repayment thereof solely out of income and revenues therefrom is specific, M.S.A. § 15.1120(8), M.C.L.A. § 390.558. The Board's powers are broad and include, but are not limited to, "all powers customarily exercised by

the governing board of a college or university." M.S.A. § 15.1120(4), M.C.L.A. § 390.554. So much is acknowledged in plaintiffs' complaint (paragraphs 5 and 6, p. 7).

Consideration must begin with a presumption of validity attaching to actions of a board, acting under statutory authority and buttressed by the Constitution of the State of Michigan (1963), Article VIII, Section 6. *Pyeatte*, supra, 102 F.Supp. p. 415. The affirmative breadth of constitutional power so granted is further amplified in Article VIII, Section 1:

"Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."

Thus, the Constitution of Michigan recognizes a policy of encouraging not only education itself, but "the means of education" and relates this by Article VIII, Sections 4 and 6 to state institutions of higher learning, specifically including Northern Michigan University.

The broad power of regulation, the specific authority to erect residence halls, and the declared policy of encouraging the means of education all indicate a public policy consistent with the general residence requirement here scrutinized. It is not altogether necessary for a court to have before it extensive affidavits in order to conclude with the majority in *Pratz*, 316 F.Supp. at page 880, that:

". . . . there is more to learning than simply sitting in a classroom and that the living and learning centers, afforded by dormitory, eating, student life and other similar facilities are just as important as the classroom instruction itself. . . . ."

If, however, specific proof is required on the point as related to Northern Michigan University, there is the uncontroverted affidavit of Dr. Niemi, setting forth the policy in constructing and operating the dormitories:

1) reasonably priced living facilities;

2) convenient to the campus;

3) for as much of the student population as possible;

4) to create an environment in which students can live and work together in a community of scholarship.

Thus, the purposes enumerated above apply directly to the constitutionally encouraged "means" of education and are valid. Counsel for plaintiff, during oral argument before the court on December 6, 1971 conceded that there may be some educational benefit from dormitory living. Need the court therefore go further? Are plaintiffs entitled to a full trial at which they can discount and dispute the claim of educational value of parietal rules and prove that the one genuine motive for the rule is to pay off the debt? If the policy had no relationship whatever to the legitimate ends as stated, and if the sole purpose were to achieve a forbidden end, then further inquiry might be warranted. The court, however, sees nothing sinister in the interest of a state-supported university in insuring its mandatory obligation to honor its bonded indebtedness. That, too, is a legitimate end. An expensive and time-consuming trial devoted to probing the collective conscious or subconscious intent of the governing board, therefore, could not affect the outcome where the purpose in so doing could be only to establish that another legitimate purpose also existed.

Having concluded, therefore, that the Board of Control has the authority to erect residence halls and to establish parietal rules and requirements, the issues then turn upon an examination of those rules in the light of the plaintiffs' several claims that they are violative of their constitutional rights of travel, education, privacy, association, procedural due process, and equal protection of the law.

With respect to the claimed unconstitutionality of the regulation and its supporting criteria, *Pratz* is directly in point on all but two features mentioned below.

An examination of the housing requirement and supporting criteria is

fully satisfying that, as applied, they are neither arbitrary, capricious, nor constitutionally discriminating. The arguments to the contrary are fully covered in *Pratz* which the court conceives to be a proper statement of the law on the several constitutional questions raised. For this reason, they need not be specifically repeated here.

The housing priorities established generally recognize that there is greater need for such parietal rules in the case of younger students. While some might well doubt an observation that wisdom and responsibility increase with age, none would claim that maturation has ceased within the age standards established. It is not necessary for the court to approve or endorse the particular exceptions provided; it is sufficient to say that there is a rational basis in human experience for the classification thus made. Nor does the method of determining exception by the Off-Campus Housing Committee violate procedural due process, see *Pratz, supra,* pp. 882–883.

Contained in plaintiffs' complaint (¶ 18, page 10) is a claim not covered by *Pratz*:

"18. That among the exceptions, not shown on said off-campus housing application form, but as announced in Defendants' Student Housing Brochure, is the policy that fraternity members are permitted to reside in fraternity houses, not university residence halls, even though they are not 23 years of age, and that obviously said exception discriminates against the female Plaintiffs who have no such option."

While this issue was not covered in plaintiffs' brief or oral argument, a ruling from the court is necessary to a full adjudication. The issue thus raised must be considered in the light of the uncontroverted facts contained in ¶ 4 of Dr. Niemi's deposition:

"4. There are three Greek-letter fraternities at the University which maintain living facilities for undergraduate students, by name: Delta

Sigma Phi, Phi Tau Alpha and Lambda Chi Alpha. Permission to maintain such facilities was granted to each organization prior to September, 1967 as a part of the University's on-campus living policy. Since 1967, no Greek-letter organization, fraternity or sorority, has been granted permission to maintain a student living facility, with the exception of organizations already having such a facility in existence."

■■ There is no claim here that prior to September of 1967 the University had banned sororities, so as to lock in thereafter a circumstance which could, arguably at least, amount to discrimination on account of sex. Without getting into the question of the desirability or undesirability of Greek-letter societies and their maintenance of off-campus housing, the Board clearly had the right to eliminate a policy permitting such off-campus housing under the authority discussed earlier. The proper administration of a university necessarily includes flexibility and adaptability to changing circumstances. When policy changes occur, it is not unreasonable to provide against the hardship which may result to those who in good faith may have relied upon a former permissive policy.

"Grandfather clauses" as the policy here might be termed, are of ancient vintage, and where they protect against loss to those who may have relied upon prior laws or regulation, they serve a rational and useful purpose in encouraging orderly change in government to meet new and desirable ends.

The history of American democracy has nearly always been one of compromise in which legitimate ends to be achieved by legislation are made more palatable and thus more possible by due attention to alleviation of hardship caused by the change. That such provisions in federal statutory law are not thereby unconstitutional and are not constitutionally discriminating under the equal protection clause, see **United States v. Maryland Savings-Share Insur-**

**1144**

ance Corp., 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4. As Mr. Justice Holmes stated in Missouri, Kansas & Texas Ry. Co. v. May, 194 U.S. 267, 269, 24 S.Ct. 638, 639, 48 L.Ed. 971:

> "When a state legislature has declared that, in its opinion, policy requires a certain measure, its action should not be disturbed by the courts under the 14th Amendment, unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched."

 The "fair reason" here may be loss of investment in the off-campus housing jeopardized by the new rule. It may be that at the time there were insufficient University-furnished accommodations and the exception provided an acceptable alternative. It may be that experience with the existing fraternity houses satisfied the University that its objective of creating a community of scholarship was already being achieved in those circumstances. It is not necessary to prove that any one reason exists. It is enough that it may, as so clearly indicated throughout the text of Justice Holmes' opinion, supra. Nor can such a policy be said to be discriminatory because of sex, where there is no showing that similar Greek-letter or societies for females ever existed, or were ever denied permission to establish off-campus residences, or that any of the plaintiffs or the class they represent were so adversely affected. The court knows of no construction of the equal protection clause which requires expansion of a classification which is being phased out under a "grandfather clause". If there is, the pleadings and proof show no such basis here.

██ Finally, plaintiffs have objected to the submission to the court subsequent to the hearing in Marquette of a copy of the defendants' brief in *Pratz* and accompanying summary of affidavits. To the extent that defendants seek to incorporate the general factual allegations of those affidavits as substantive proof to be considered in connection with this case, the objection is well taken. As showing and explaining the background in the *Pratz* case itself, and thus throwing light upon its meaning, such material is, however, appropriate and of academic interest.

Therefore, on the basis of the foregoing reasons, it is the opinion of the court that defendants' motion for summary judgment should be and the same is hereby granted.

It is so ordered.