**Fred COOPER et al.**

**v.**

**Honorable Enoch T. NIX, etc., et al.**

**Civ. A. No. 17492.**

United States District Court,
W. D. Louisiana,
Shreveport Division.

May 29, 1972.

Donn Moss, P. Raymond Lamonica, Hebert, Moss & Graphia, Baton Rouge, La., for plaintiffs.

Fred Benton, Jr., Benton & Moseley, Baton Rouge, La., Tom Matheny, Pittman & Matheny, Hammond, La., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR PRELIMINARY INJUNCTION

DAWKINS, Chief Judge.

In this action, plaintiffs challenge the application and implementation of on-campus housing regulations at Southeastern Louisiana University (SLU) in Hammond, Louisiana.

The matter first came before the Court January 6, 1972, when plaintiffs sought a temporary restraining order prohibiting defendants from requiring students 21 years and older to live in campus dormitories while others were permitted to live off campus. Because of this Court's prior familiarity with the applicable State regulations through Pratz v. Louisiana Polytechnic Institute, 316 F.Supp. 872 (W.D.La., 1970, three-Judge Court), appeal dismissed 401 U.S. 951, 91 S.Ct. 1186, 28 L.Ed.2d 234, affirmed summarily per cur. 401 U.S. 1004, 91 S.Ct. 1252, 28 L.Ed.2d 541 and due to the advanced academic class standing and correlative irreparable injury, the temporary restraining order was granted. Due to this Court's crowded docket, however, a hearing on the preliminary injunction was delayed until April 10, 1972.

After a three-day hearing, based upon the evidence adduced and again because of the Court's prior familiarity with the written regulations and law through Pratz, a preliminary injunction was granted at the close of evidence and arguments.

The record was left open for the introduction of depositions of State Board members, Louis J. Michot and Jesse Bankston and former President of SLU, Luther Dyson. The question of a final injunction will be taken under advisement upon preparation of the transcript of testimony and briefing. The present findings of fact and conclusions of law are based upon the record in its present posture, subject to further findings and conclusions after benefit of further evidence and briefs.

This Court has jurisdiction over the properly asserted class action (Fed.R. Civ.P. 23) based upon 28 U.S.C. §§ 1343 (3), (4), 2201, and 42 U.S.C. § 1981 et seq. Plaintiffs asserted venue in the Western District of Louisiana because the majority of the defendants reside in the Western District and the President and Vice President of the State Board of Education reside in the Shreveport Division of this District. Plaintiffs further asserted venue here due to this Court's prior familiarity with State regulations through the Pratz decision (see complaint, Paragraphs 1 and 2). Defendants have not challenged venue, but rather admitted proper venue (Answer, Paragraph 2).

■ Defendants have challenged the subject matter jurisdiction of this Court, but that challenge clearly is without merit. (See, e. g., 42 U.S.C. § 1983). All other motions by defendants, primarily those to dismiss for failure to state a claim upon which relief can be granted and for summary judgment, were referred to the merits and do not require separate treatment here.

■ Defendants also challenge plaintiffs' standing to maintain this action. Plaintiffs are all students at SLU who assert the action individually and as class representatives. Plaintiff DeLord, at the time suit was filed, was a 21-year-old senior who desired to live off campus at Cardinal Newman Hall, a residence operated by the Roman Catholic Diocese of Baton Rouge, described more fully infra. Plaintiff Michele, at the time suit was filed, was 22 years old and also desired to live at Cardinal Newman Hall. Plaintiff Doerries was a 22-year-old senior and desired to live off campus at a place of his own choosing (not Car-

dinal Newman Hall). At the time of trial, Doerries and Michele were no longer students, Doerries having graduated and Michele having withdrawn from the University for personal reasons. Doerries did, however, testify at the trial, and documents relating to both were introduced into evidence. Both Doerries and Michele, along with the other individual plaintiffs, were required to execute surety agreements with the University in order to continue in school. Thus, they still have a real (monetary, in addition to constitutional,) interest in this litigation and thus still have standing to assert this cause of action individually and as class representatives.

Plaintiff Fred Cooper is president of the Student Government Association and entered into this litigation pursuant to a resolution of the Student Senate which was approved by a majority of the student senators. In the context of this case, it cannot seriously be argued that Cooper is not a proper plaintiff and class representative. We find, therefore, that plaintiffs have standing to attack the questioned regulations and their implementation.

" . . . the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). See also Association of Data Processing Service Organizations, Inc., v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

■ Contrary to defendants' contention, this matter is "ripe" for adjudication. Each of the individual plaintiffs has exhausted all available administrative or institutional remedies without relief (with the exception of Cooper due to his unique standing). The plaintiffs have made every available effort to obtain relief to all institutional authorities and were afforded no relief. They applied then to the State Board of Education, but after several months no action was taken on their appeals. While it is clear that a 42 U.S.C. § 1983 action is supplemental to State relief, Moreno v. Henckel, 431 F.2d 1299 (5th Cir., 1970), and exhaustion may not be required, it is clear here that plaintiffs have made prior reference to institutional authority and have an authoritative institutional decision. See Hall v. Garson, 430 F.2d 430, 436 note 11 (5th Cir., 1970); Stevenson v. Board of Education, 426 F.2d 1154 (5th Cir., 1970). No evidence was introduced to show otherwise.

■ Contrary to the situation that existed in *Pratz*, this is not a proper case for a three-Judge District Court pursuant to 28 U.S.C. § 2281. Plaintiffs do not challenge a statute or policy having state-wide application and which, if enjoined, would paralyze an entire state-wide policy. Plaintiffs challenge only the implementation and application of on-campus housing regulation requirements at SLU. The record, in fact, reflects that there is not a systematic state-wide policy, and that discretion is left to University officials. See Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967). *Cf.* Mitchell v. Donovan, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970).

### Progeny of Pratz?

Due to heavy reliance by defendants on Pratz v. Louisiana Polytechnic Institute, *supra*, it is incumbent upon this Court, as the author of that opinion, to place *Pratz* in its proper perspective. This is uniquely appropriate here since defendants rely upon language of this Judge in *Pratz* to support their position.

*Pratz* was a broadside and "shotgun" attack upon the entire concept of reasonable parietal rules. The plaintiffs there argued that *no* parietal rules were valid, relying primarily on the First Amend-

ment. The matter was heard upon stipulation of facts and affidavits by way of a Motion for Summary Judgment. No "live" evidence was taken as to the actual implementation and application of the parietal rules.

Significantly, all individual plaintiffs in that case were under 21 years of age. The title of the case reflects that their fathers were suing on behalf of their minor sons. The complaints in each of the consolidated cases also reflected that students over 21 were not in fact being required to live on campus. This, of course, explains why there were no major student plaintiffs. There was no evidence reflecting that students over 21 were being required to live on campus, and Louisiana Tech's rules did not so require.

While the schedules (regulations) do contain the phrase "regardless of age," no special significance was attached to that phrase in light of the nature of the action by minors and in light of the overwhelming number of issues presented and documents introduced into evidence.

This Judge, as author of *Pratz*, the results, rather than opinion, being concurred in by Judge Edwin Hunter (who specifically concluded in his concurrence that "as this case comes to us, it concerns not a statewide matter *but rather a situation unique to Louisiana Tech . . .* "), did not intend to indicate that the State had the right to set up parietal rules for students at State supported institutions "regardless of age." A determination of the "regardless of age" issue was not necessary for disposition of the issues presented in *Pratz*. That issue was not clearly before the Court and any language tending to support such a conclusion must be recognized as, at best, mere dictum.

### Age 23 "Exemption"

In their verified complaint, plaintiffs allege that defendants were requiring,

pursuant to *written* regulation in the SLU Handbook, single undergraduate students 21 and 22 years old to live on campus, setting age 23 as an automatic exemption for off-campus residence privileges.[1] Plaintiffs challenge the age 23 requirement as arbitrary and a violation of equal protection, substantive due process, and First Amendment rights, especially in light of the fact that social fraternity members were allowed to live off campus, regardless of age or class standing, and in light of the other exemptions.

Defendants in their Answer asserted that the age 23 "exemption" had been deleted, and introduced by affidavit of the President of the University on their Motion to Dismiss a copy of a printer's proof requiring single undergraduate students, "regardless of age," to live on campus. With respect to the fraternity issues, defendants admit that they allowed members of two fraternities to live off campus but contend only a small number are involved, 23 at present, and assert a very nebulous and undefined legal obligation to them.

The evidence adduced at the hearing reflected that although the age 23 reference was no longer written, it was, in fact, applied by the Dean of Men, Dean of Women and Dean of Student Life as a "blanket exemption." Under the present procedures, a student 23 years old need only apply to the Dean of Men or Dean of Women and he or she would automatically get an exemption without further inquiry. When asked whether there was any intent to publish or make known this "new" and informal 23 age cutoff, the respective deans replied, "no." The Court finds, therefore, that students 23 years old and older are allowed to live off campus under this unwritten rule just as they were before this action was filed pursuant to a written rule. There is no change from the prior and challenged procedure except that now the regulations are unwritten and less

1. The full text of Schedules 44 and 45 reflecting the State Board's written regulations is set forth in *Pratz, supra.* We are concerned here only with Schedule 44 since the evidence reflects that there is dormitory space available on campus.

understood by the students as well as some officials.

Interestingly, and to emphasize the point, neither the President of the University nor the Board members who testified were well acquainted with this "new" 23 age cutoff. Each of the three Board members who testified stated that they felt they could require a student to live on campus to any age (one going so far as to say 100 years old!) based upon the concept that it was "a privilege" to attend a State University and if the student did not want to attend under their residency rules, he simply could go elsewhere.

The President of the University testified in deposition that a student would be required to either live on campus or apply for an exemption and be evaluated by the Housing Review Committee, whether he be "17 or 70," and must present other "good and sufficient" reasons to live off campus regardless of age.

The sole and only reason given for selecting the age 23 cutoff is that normally a person of such age is not expected to be an undergraduate student at SLU. It is essentially a mechanism to require all single undergraduates to live on campus if not otherwise favored with a specific exemption.

### The Mollere Case—Background

In the 1969-1970 academic year, SLU, pursuant to resolution of the State Board of Education, began requiring, among other things, that unmarried women students under 21 not living with their parents or a close relative, live on campus.

These regulations were challenged in Mollere et al. v. Southeastern Louisiana College et al., 304 F.Supp. 826 (E.D.La., 1969) and held invalid. Judge Cassibry in striking down those regulations specifically found:

"It is undisputed that the College's sole reason for requiring women under 21 and freshmen men live in college residence halls was to meet the financial obligations which arose out of construction of those dormitories. When the Court specifically asked Mrs. Parker, the Dean of Women, the reason for the requirement, she testified that the sole and only reason was to increase the revenue of the housing system. Indeed, when she was asked why this particular category of students was chosen, she replied that the girls in this group together with the freshmen boys comprised the precise number needed to fill the dormitory vacancies [footnote omitted]. This was confirmed by the Auditor of the University and their testimony was not contradicted by any other College official." (At p. 827.)

Dean Parker in the trial of this matter did not contradict the testimony but merely asserted that another reason (which neither she nor anyone else presented to the Mollere Court) was to afford students a "living and learning" experience of dormitory life.

As in Mollere, the reason for class selection of dormitory residence is here directly related to the number of dormitory vacancies or potential students rather than to any particular academic or "living and learning" status. There is no attempt to expose, for example, all freshman regardless of age to the "living and learning" processes of the dormitory. A 23-year-old freshman is automatically exempt while a 21-year-old senior who might have lived in a dormitory three years is still required to live on campus. It is clear that the requirement of dormitory living at SLU is related directly to an attempt to fill the dormitories rather than an attempt to provide those students who have not been afforded this dormitory "living and learning" experience to be exposed to it.

This fact becomes even more apparent when reference is made to returning military veterans. The record in this case clearly reflects that returning veterans, including one 22-year-old ex-Marine and one 22-year-old Army veteran, were required to live on campus. Although Schedules 44 and 45 allow for a

returning veteran exemption, University officials consider and apply this reference as only "illustrative" and do not consider themselves bound thereby. The University position is that a returning veteran, unless he is 23 years old or has other "good and sufficient reason" is required to live on campus.

It is inconceivable to this Court that a returning 21 or 22-year-old military veteran be required to live in a dormitory for his full education through the "living and learning" experience of dormitory life. None of the State defendants made serious attempt to justify this requirement on the basis of the "living and learning" experience necessary for a full University education.

In *Pratz* we recognized that there was a "thin line" between whether the residency rules were developed in order to provide the students with a better educational experience and whether they were developed primarily to retire a bonded indebtedness. The evidence of the manner of implementing these residency rules at SLU demonstrate that they are not primarily designed to include *those students who can reasonably benefit from dormitory life.*

 There was no direct testimony supporting the contention that requiring a student who is 21 years old or older to live on campus in a dormitory was reasonably related to the educational process. Certainly there was no evidence presented to support the requirement that returning military veterans living in dormitories is reasonably related to the educational process. To the contrary, expert witnesses on behalf of plaintiffs stated that requiring a student of this advanced age, and otherwise having full legal status, to live in campus dormitories was not reasonably related to the university educational process and further might prove detrimental in terms of alienation and development of characteristics of maturity by "being on their own." While the "living and learning" concept *per se* is not challenged, the implementation of that concept at Southeastern, insofar as it requires students of full legal majority and returning military veterans to live on campus, is found not to be reasonably related to the educational process.

### *The Social Fraternities and Cardinal Newman Hall*

As noted, there are presently at SLU two off-campus fraternities whose members are allowed to live off campus in the respective fraternity houses regardless of age or their class standing. Under the regulations, a 17-year-old "pledge" is allowed to live in the fraternity house. The two fraternity houses are converted frame individual dwellings, one with a student monitor and the other with a "housemother" providing supervision. These fraternity houses began operating in 1968 and in 1970.

Cardinal Newman Hall is a modern brick, 90-bed dormitory with lounge areas, study areas, and supervision by one nun, who holds an M. A. in Psychology and counselling, and two priests, one holding a Ph. D. in Sociology and one with an M. A. in Education, who act as supervisors and counsellors to the students who live there as well as others.

The dormitory is operated on a racially and religiously integrated basis and is co-educational. Men and women live on separate floors with no in-room visitation rights. One priest and one nun are on duty to supervise and counsel at all times. The evidence totally reflected the propriety of the situation.

Cardinal Newman Hall, which is located directly across the street from the University, is physically closer than either fraternity. It was built in 1964, in response to the then housing shortage at SLU and was welcomed by the University at that time. When the University constructed its own dormitories, Cardinal Newman Hall was not afforded an exemption as were the two fraternities. Two of the plaintiffs here, DeLord 21 and Michele 22, both Catholics, desire to live in Cardinal Newman Hall but were

denied that right by the University.[2] The record clearly reflects that if either had desired to live in one of the fraternity houses and were members or "pledges," they would be allowed to do so.

A young lay Methodist minister who testified at the trial of this matter, also attempted to live in Cardinal Newman Hall but was denied that right because it was a "dormitory"-like residence and was told that if he desired to live in a "dormitory" he must live on campus. He explained in great detail that he thought Cardinal Newman was a superior residence and that it reflected a near optimum living situation. Despite the University's refusal to allow him to reside in Cardinal Newman Hall, he is allowed to live some miles away with another lay minister without the benefits of the living situation which he sought.

The University made several attempts to distinguish the relationship of the fraternities with the University and that of Cardinal Newman Hall with the University. First, they asserted that Cardinal Newman Hall never "applied for such status." This is clearly refuted by the record in that much correspondence was exchanged between the University and Cardinal Newman personnel. Moreover, there was, and still is, uncertainty as to whether the University or the State Board must approve such applications. In any event, the evidence clearly reflects that such an application would be utterly in vain in that neither the Board nor the University intends to grant them such an exemption.

Second, defendants assert that members or "pledges" of fraternities are allowed to live off campus because of their historical relationship with the Universities. The simple answer to this is that in fact Cardinal Newman Hall was existing as an off-campus facility four to six years prior to the fraternities in ques-

tion. Moreover, the Court may take judicial notice that Newman Halls have traditionally been associated with universities, especially in Louisiana.

Third, defendants argue that there is some special "legal" relationship with the fraternities which does not exist with respect to Cardinal Newman Hall. The University counsel who testified and asserted this "legal relationship" failed to adequately specify its nature. Testimony and documents introduced reflected that this "legal" obligation to the fraternities was at best a nebulous one. Certainly the relationship with Cardinal Newman Hall is no more nebulous and perhaps more concrete in terms of its long prior existence, considering the reliance of the officials of Cardinal Newman Hall on university acceptance of its facilities when they were constructed.

Finally, defendants assert that fraternities are a "student group" while residents at Cardinal Newman Hall are not. This is not supported, and indeed is refuted by the record. The testimony reflected that both in fact are student groups electing officers and participating as a group in extra curricular and intramural functions. Certainly the absence of Greek letters, historical ritual, and a greater degree of selectivity, does not make Cardinal Newman less a student group than the social fraternities.

### Conclusions of Law

Under the facts of this case, the Court need not look beyond the question of whether there exist Equal Protection deprivations in disposing of the issues presented here. Judgment is therefore reserved on all other constitutional questions presented. No inference should be made as to their merits.

 It is not for the Court to consider whether the rules challenged here are wise or expedient but merely whether

2. DeLord and Michele individually and as class representatives have standing to challenge the discrimination between Cardinal Newman Hall and the Fraternities since both sought to live in Cardinal Newman Hall. See Flast v. Cohen, *supra*; Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Eisenstadt v. Baird, *supra*.

they are a reasonable exercise of the power and discretion of school authority. See Burnside v. Byars, 363 F.2d 744 (5th Cir., 1966).

■■ Although courts are reluctant to interfere with conflicts which arise in the operation of schools, they will interfere when such conflicts "directly and sharply implicate basic constitutional values." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). It is clear that students *qua* students do not relinquish constitutional rights upon entering universities.

"In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligation to the State." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 511, 89 S.Ct. 7?3, 739, 21 L.Ed.2d 731 (1968). *Cf.* Zanders v. Louisiana State Board of Education, 281 F.Supp. 747 (W.D.La., 1968), Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th ·Cir., 1961).

The Court in *Tinker* quoted with approval the language of Mr. Justice Jackson in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

"The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. *That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.*" 319 U.S. at 637, 63 S.Ct. at 1185. (Emphasis added.)

Mr. Justice McReynolds' statement in 1923 in Meyer v. Nebraska, 262 U.S. 390, 402, 43 S.Ct. 625, 67 L.Ed. 1042, reflects that we are not here dealing with novel doctrines of constitutional law but rather with fundamental principles which while at that time were couched in terms of substantive due process are, in more recent times, more often posited in terms of equal protection of the law:

"While this Court has not attempted to define with exactness the liberty thus guaranteed [due process], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and *generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.* [Citations omitted.] The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect. Determination by the Legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts. [Citation omitted.]" (Emphasis added.) 262 U.S. at 399–401, 43 S.Ct. at 626.

Justice McReynolds went on to make the following pertinent observation:

" . . . In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to of-

ficial guardians. Although these measures have been deliberately approved by men of great genius their ideas touching the relationship between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution." 262 U.S. at 402, 43 S.Ct. at 627. (This language was quoted in *Tinker, supra,* 393 U.S. at 511–512, 89 S.Ct. 733.)

Chief Justice Burger recently has outlined the basic principles governing application of the Equal Protection Clause in Reed v. Reed, 404 U.S. 71, 75–76, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971):

> "In applying that clause, this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. [Citations omitted.] The Equal Protection Clause of that Amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. *A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'* F. S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)." (Emphasis added.)

The Court recently has summarized the method of analysis employed in determining whether State actions are violative of the Equal Protection Clause:

> "To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the charac-ter of the classification in question; the individual interests affected by the classification; and the governmental interest asserted in support of the classification." Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972).

The "character of the individual interest affected" is critical in determining the standard against which the classification will be tested. If the individual interest is characterized as a "fundamental right" the State must have a *compelling* interest to support the classification. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Dunn v. Blumstein, *supra.*

On the other hand, if a "fundamental right" is not affected by the classifications, the State need only show a rational nexus or reasonable connexity between the legitimate governmental interest and the classification. See, *e. g.,* Reed v. Reed, *supra,* and cases cited therein.

While we think that determination of whether or not a person of *full legal majority* must live in an institutional environment may be a "fundamental right" under the recent jurisprudence and therefore subject to the more stringent compelling State interest test, we do not find it necessary to make that determination in the present context and reserve judgment thereon. *Cf.* Shapiro v. Thompson, *supra*; Cipriano v. City of Houma, *supra*; City of Phoenix v. Kolodziejski, *supra.* We test the defendants' action in light of the less stringent rational nexus or reasonable connexity test.

Defendants are classifying plaintiffs in relevant part here based upon their age and whether or not they are members of social fraternities. One class of

students, those over 23 years old, are allowed to live off campus, while those under 23 are denied that right unless otherwise specially exempted. One class of students, those who are members of the two fraternities are allowed to live off campus, while another class otherwise similarly situated who desire to reside in Cardinal Newman Hall are denied that right.

▮ The fraternity-Cardinal Newman Hall classification is clearly unreasonable and must be held to amount to systematic invidious discrimination which is prohibited by the Equal Protection Clause of the Fourteenth Amendment. Based upon the evidence presented and our findings *supra*, there is no rational basis for allowing students at SLU to live off campus in social fraternity houses and denying them the right to live in Cardinal Newman Hall.

The Court therefore holds that defendants are depriving students who desire to live in Cardinal Newman Hall Equal Protection of the law.

▮ With respect to the age classification outlined above, even applying the less stringent reasonable clssification test, we find such classification constitutionally infirm as implemented. The only governmental interest asserted in support of the classification is to further the students' education by exposing them to the "give and take" of dormitory life.[3] Defendants consistently have denied here, as they did in *Pratz*, that financial interests are a primary reason or justification for the University's parietal rules. We do not find it necessary to question that position but accept it

*arguendo* and test the reasonableness of the age classification against the proclaimed interest of furthering the students' education.

As the facts we have found indicate, the age 23 classification is related solely to the average age range of students at the University. The record clearly reflects that the University has not attempted to limit this residence requirement to those who reasonably will benefit educationally therefrom. There was no evidence that plaintiff, Doerries, or the returning military veterans, all 22 years old, would benefit educationally from dormitory life. There was no serious attempt to justify on educational grounds the reasons for requiring their on-campus residency. The only purported "justification" was that these students might *contribute* to the education of other younger students. We think this contribution theory is wholly irrelevant to the issues presented. The question is whether the requirement that students, such as plaintiffs here, might reasonably benefit educationally to such a substantial extent as to justify infringing upon their right to choose their own place of residence. Doerries had lived in a dormitory for three years. The veterans had, of course, much prior "give and take" of communal life. Yet these students were required to live on campus, while other classes of students were not. None would have been denied off-campus residency if they had been 23, rather than 22 or 21 years old, even if they had never lived in a dormitory atmosphere before.

We find that defendants have not established a reasonable relationship be-

---

3. There was much symbolic talk about the "give and take" of the "living and learning" experience of dormitory life. However, there was a paucity of concrete evidence as to what these phrases in fact reflected in terms of dormitory life at SLU. When the President of the Student Body, who had lived in a dormitory at SLU for three years, testified, his uncontroverted testimony reflected that dormitories are primarily and almost entirely simply a facility for housing. While we recognize the "accidental" educational benefits that might accrue from communal living, there is serious doubt that such might justify requiring students to live in dormitories, especially when they are otherwise of full legal capacity by age.

tween requiring the 21 and 22 year old plaintiffs to live on campus and the University educational process. Defendants utterly have failed to show that requiring all 21 and 22 year old single undergraduates live on campus, *as implemented at SLU* is fairly and substantially related to the educational process. Defendants have further failed to show that all students in similar circumstances—who would reasonably benefit from dormitory life educationally—are treated alike.

Moreover, the implementation of campus residency rules and determination of the arbitrary age 23 limit clearly reflects that University officials are granted unguided and unfettered discretion in determining who shall and who shall not be required to live on campus. While written guidelines are presented, the flexibility in implementation resulted in extreme vagueness. For example, there was great confusion as to whether there was a 23-age cut-off before the trial, who made such a determination and upon what educational basis it was posited. Even at the hearing, witnesses testified that students would not be made aware by University officials of such an "exemption" but that it was more in the nature of an "understanding." Many official acts were explained cryptically as based upon "good and sufficient" reasons.

We think such vague, undefinitive guidelines *as implemented* when limiting rights of plaintiff students are not reconcilable with principles of due process and equal protection of the law.

We emphasize that the decision in this matter is based primarily upon factual findings as to the implementation of parietal rules to the 21 and 22 year old plaintiffs and those similarly situated at SLU. We announce no new principle of law but simply attempt to apply general and fundamental concepts of substantive due process and equal protection of the law to the facts as found.