Gail **PROSTROLLO** and **Lynn Severson** for themselves and in behalf of all others similarly situated, Plaintiffs,

v.

The **UNIVERSITY OF SOUTH DAKOTA** et al., Defendants.

Civ. No. 73–4063.

United States District Court,
D. South Dakota, S. D.

May 31, 1974.

See also 369 F.Supp. 778.

Michael B. Crew of Crew & Crew, Vermillion, S. D., for plaintiffs.

Carleton R. Hoy and Michael F. Pieplow, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for defendants.

### SUPPLEMENTAL MEMORAN-
### DUM DECISION

NICHOL, Chief Judge.

Pursuant to a defense motion for a new trial, the Court of Appeals remanded this case to the District Court for the limited purpose of holding an evidentiary hearing under Fed.R.Civ.P. 60(b)(2).[1] Based on the following rea-

---

1. Rule 60(b) *Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.* On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); . . .

soning, this Court concludes such relief is not warranted and its previous decision will not be disturbed.

Rule 60(b) provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances. Hoffman v. Celebrezze, 405 F.2d 833, 835 (8th Cir. 1969). The defendants have declared that such a showing has been made by their newly discovered evidence consisting of the 1973 fall semester grade-point averages for on and off-campus students at the University of South Dakota which indicate that on-campus students perform better academically than off-campus students.

I have two contradicting reservations as to whether the evidence presented falls properly within Rule 60(b)(2). The first occurs as to whether defendants' evidence is "new" or "newly discovered." There can be no Rule 60(b)(2) relief for evidence which has only come into *existence* after the trial is over, for the obvious reason that to allow such a procedure could mean the perpetual continuation of all trials. "Newly discovered evidence" under Rule 60(b) refers to evidence of facts in existence at the time of the trial of which the aggrieved party was excusably ignorant. Kender v. General Expressways, Limited, 34 F.R.D. 237 (E.D.Pa.1963). There is serious question as to whether the 1973 fall-semester grade-point averages (GPA) were even in existence at the time of the trial, as the trial proceedings took place on November 23, 1973, the semester was not over until mid-December, 1973, at the earliest, the memorandum decision of this Court was rendered January 21, 1974, and the grade averages were not compiled until sometime shortly before February 13, 1974.

A second contrary reservation occurs as to whether, assuming the facts to have been in existence at time of trial, such statistics on semester grade-point averages can be considered "newly discovered evidence." The similarities between the 1973 fall semester GPA statistics (which were not available for trial) and the same statistics for the 1973 spring semester (which would have been available) are such that this Court sees no reason why such statistics for past semesters could not have been introduced at trial for the same effect as they were presented at the post-trial evidentiary hearing. Although the University computer center might not have had stored in its computer bank all the separate information necessary to compile individual semester GPA statistics, (See Housing Director Schnell's deposition), it is certainly true that the computer center could have obtained such information from the registrar's office or various other University sources and could have compiled such statistics prior to the end of the trial in this case upon request by the defendants. Although not previously *compiled* on a semester basis, the facts and figures *were available* before judgment was rendered in this case.

While this Court has expressed doubts as to whether the grade-point average statistics constitute "newly discovered evidence", it has no such doubts in relation to the article entitled "The Impact of Dormitory Living of Students" by Alexander W. Astin, which was presented to the Court as a defense exhibit at the post-trial evidentiary hearing. The article, published in the summer of 1973, had been read by at least two University administration officials prior to November 23, 1973, and was, with "due diligence", decidedly discoverable before trial, and certainly discoverable in time for defendants to have moved for a new trial under Rule 59(b), Fed.R.Civ.P.

In the memorandum decision filed January 21, 1974, this Court found that plaintiffs had met their burden of proof and that the University of South Dakota housing regulation, as implemented, was unconstitutional. Since a post-trial evidentiary hearing was or-

dered by the Eighth Circuit Court of Appeals, this Court feels compelled to thoroughly reexamine and explicate its reasoning as to why relief will not be granted, *even assuming* defendants' evidence to be validly within the Rule 60(b)(2) category. It should be made clear that this Court does *not* consider the evidence presented "newly discovered" under Rule 60(b)(2), but that such an assumption is made only to show the Court's decision would not be altered in any event, because the post-trial evidence does not change the denial of equal protection resulting from the enforcement of the housing regulation.

### Equal Protection

The only students included in the off-campus statistical group performing more poorly academically are those students who are already excused under the existing housing regulation. Indeed, the on-off distinctions were created by the University itself. No comparative evidence was presented as to scholastic performance of those freshmen and sophomores who lived off-campus *before* passage of the regulation and who were then required to live on campus after the regulation was enacted. The fact that those freshmen and sophomores currently living off-campus perform more poorly academically lends support to the previously drawn conclusion that the regulation is not accomplishing an educational purpose, since those *allowed* to live off-campus *under* the regulation are those performing the most poorly academically.

The Astin article shows that commuters and those living at home have a greater tendency not to finish their degree than either private housing residents *or* dorm residents. Yet, under the USD housing regulation, both commuters *and* Vermillion residents (i. e. those living at home) would be excused from dorm living. Thus, those who are given the poorest chance of completing their degrees would, under the existing regu-lation, be allowed to live off campus while those desiring to live in private housing would not, even though students living in private housing are shown (by the Astin article) to have a much lower differential (in comparison to those living at home) from the dorm students as to degree completions.

Additionally, freshmen and sophomore fraternity and sorority students are included in the off-campus group who perform more poorly academically than the dorm residents yet they, too, are excused from living in dorms under the regulation while those who would like to live in private housing are not. Thus, as was said in this Court's prior decision on this case:

> And, even assuming, arguendo, that the purpose behind the regulation *were* educational, there is not one shred of evidence that the *particular class* of freshmen and sophomore students would benefit educationally any more than those *students who are not* required to live in dorms. Such irrational classification is at the heart of all equal protection decisions.

If any benefits *are* assimilated from dorm living, such benefits cannot be forced on one group of students while others in a similar situation are excused.

### Financial Purpose

The answers to interrogatories from a similar case pending in the U.S. District Court of Southern Iowa were noted by this Court with interest, and with the recognition that in some instances, parietals can certainly accomplish educational goals. (I might add that the interrogatories and answers were certainly *not* in existence at the time of trial and therefore would not fall within Rule 60(b)(2) as "newly discovered evidence.") Situations, however, differ at every college and University and this Court must narrow its ruling to the facts existing in the case at hand. Despite defendants' assertions to the contrary, the

clearest piece of evidence showing the purpose behind the enactment of the USD housing regulation is the 1964 Regents' Resolution, presented in the evidentiary hearing as Deposition Exhibit 1.

WHEREAS, it is necessary to establish parietal rules and rates for the dormitory building (herein called the "Project"), at said University of South Dakota.

1. This Board hereby establishes and covenants to enforce so long as any of said University of South Dakota Dormitory Revenue Bonds of 1964 are outstanding or unpaid these parietal rules and regulations that will (1) assure maximum occupancy and use of the facilities and services afforded by the aforesaid Project and connected facilities, (2) provide (a) the debt service on the said bonds (b) the required reserve therefor, (c) the reserves in the Repair and Replacement Reserve Account provided for in the aforesaid Resolution, and (d) the operating and maintenance expenses of the Project facilities.

Even assuming that the contention is accepted that the defendants' post-trial evidence is "newly discovered" under Rule 60(b)(2), this Court retains its initial conclusions that

the object of the contested [housing] regulation is to insure retirement of the bond indebtedness, and that making only certain freshmen and sophomores pay by living in the dorms is arbitrary and unreasonable, contrary to equal protection mandates. As the court said in Mollere et al. v. Southeastern Louisiana College et al., 304 F.Supp. 826 [828] (D.C.La.1969),

'Absent the special educational considerations previously mentioned the support of the housing system is an obligation which should fall on all students equally just as does, for example, tuition. Since the obligation is essentially *monetary*, then all must pay or none. To select a group less-than-all, to fulfill an obligation which should fall equally on all, is a violation of equal protection no matter how the group is selected.'

This Court determines that no relief is due defendants under Rule 60(b), Fed.R.Civ.P. The memorandum decision of January 21, 1974, remains in force, although an order has been entered granting suspension of the injunction pending appeal, pursuant to Rule 62(c), Fed.R.Civ.P.